[No. E023991. Fourth Dist., Div. Two. July 20, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK GENE GIARDINO, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts D, E, and F.

456

## COUNSEL

Martin Nebrida Buchanan, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, John T. Swan and Carlson M. Legrand, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McKINSTER, J.**—In reviewing this defendant's convictions for, inter alia, rape by intoxication and oral copulation by intoxication, we hold that those crimes are committed when the victim is so intoxicated that he or she is incapable of exercising the judgment required to decide whether to consent to those sexual acts, and that the jury should be instructed accordingly.

### PROCEDURAL BACKGROUND

In an 11-count information, the defendant was charged with committing rape by intoxication (Pen. Code, § 261, subd. (a)(3))[1] in counts 1, 2, and 3; with committing oral copulation by intoxication (§ 288a, subd. (i)) in counts 4 and 5; with committing oral copulation with a minor (§ 288a, subd. (b)(1)) in counts 6 and 7; with committing unlawful sexual intercourse (§ 261.5) in counts 8, 9 and 10; and with molesting a child (§ 647.6) in count 11. The jury found him guilty as charged in counts 2 through 7 and 9 through 11, but

---

[1]Unless specified otherwise, all further section references are to the Penal Code. In particular, subdivision (a)(3) of section 261 shall be referred to as section 261(a)(3).

not guilty as to counts 1 and 8. In addition to a prison term of 13 years and 2 restitution fines, the defendant was ordered to pay restitution to the victim in the sum of $7,359. (§ 1202.4, subd. (f).)

## CONTENTIONS

The defendant contends that the convictions on counts 2 through 5 must be reversed because the trial court erred (1) by refusing to instruct the jury that lack of consent is an element of the charges of rape by intoxication and oral copulation by intoxication, (2) by failing to instruct the jury concerning the meaning of "prevented from resisting," and (3) by failing to instruct the jury concerning the effect of an honestly and reasonably held but mistaken belief in the victim's ability to give legal consent. He contends that those same counts must also be reversed because there is insufficient evidence to support a finding that the victim was unable to physically resist. He contends that all counts must be reversed because the trial court refused to permit the victim to be impeached by evidence of an auto theft. And he contends that the restitution order is not supported by substantial evidence.

## DISCUSSION

### A. Lack of Actual Consent Is Not an Element of Rape by Intoxication.

The defendant asked the trial court to give a "consent instruction" regarding the charges of rape by intoxication and oral copulation by intoxication. In his oral request, the defendant did not describe the requested instruction in any detail, but the trial court interpreted him to be asking that the jury be instructed either that lack of consent was an element of those crimes or that consent is a defense. The trial court refused to do so.

Reasoning that lack of consent is an element of rape, or conversely that consent is a defense, the defendant contends that the trial court should have defined consent in accordance with section 261.6 and instructed the jury that lack of consent is an element of the offenses of rape by intoxication and oral copulation by intoxication.[2] He is mistaken.

#### 1. Lack of Actual Consent Is Not an Element of Offenses Proscribing Sexual Intercourse with Persons Who Lack the Capacity to Give Legal Consent.

In the context of rape and other sexual assaults, "consent" is defined as the "positive cooperation in act or attitude pursuant to an exercise of free will."

---

[2]For convenience, we shall discuss only rape by intoxication, but our analysis applies equally to both offenses.

(§ 261.6.) To give consent, a "person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (*Ibid.*; accord, CALJIC No. 1.23.1.) In short, that definition describes consent that is actually and freely given without any misapprehension of material fact. We shall refer to this as "actual consent."[3]

By itself, the existence of actual consent is not sufficient to establish a defense to a charge of rape. That the supposed victim actually consented to sexual intercourse disproves rape only if he or she had "sufficient capacity" to give that consent. (See *People v. Mayberry* (1975) 15 Cal.3d 143, 154 [125 Cal.Rptr. 745, 542 P.2d 1337]; 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Decency and Morals, § 774, p. 873.) For example, if the victim is so unsound of mind that he or she is incapable of giving legal consent, the fact that he or she may have given actual consent does not prevent a conviction of rape. (*People v. Griffin* (1897) 117 Cal. 583, 585-587 [49 P. 711], overruled on others grounds by *People v. Hernandez* (1964) 61 Cal.2d 529, 536 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092].) Hence, the consent defense fails if the victim either did not actually consent or lacked the capacity to give legally cognizable consent.

The distinction between actual consent and legal consent is further illustrated by the statutory definition of rape. Some of the various means of committing rape specified in the subdivisions of section 261 deal with the lack of the victim's actual consent while others deal with the victim's lack of capacity, i.e., with the lack of legal consent.

In the context of rape, "against the victim's will" is synonymous with "without the victim's consent." (*People v. Cicero* (1984) 157 Cal.App.3d 465, 480 [204 Cal.Rptr. 582]; CALJIC No. 10.00.) Therefore, by specifically referring to intercourse accomplished against the victim's will, subdivisions (a)(2) (force or duress), (a)(6) (threat of retaliation), and (a)(7) (threat of detention or deportation) of section 261 describe instances in which the victim has not actually consented. The same is true when the victim is not aware of the nature of the act (*id.*, subd. (a)(4)(C)) or has been deceived into believing that the defendant is the victim's spouse (*id.*, subd. (a)(5)). In those cases, there is no actual consent because the victim lacks "knowledge of the nature of the act or transaction . . . ." (§ 261.6.) By contrast, subdivision

---

[3]Actual consent must be distinguished from submission. For instance, a victim's decision to submit to an attacker's sexual demands out of fear of bodily injury is not consent (*People v. Guldbrandsen* (1950) 35 Cal.2d 514, 520 [218 P.2d 977]; *People v. Peterman* (1951) 103 Cal.App.2d 322, 325 [229 P.2d 444]) because the decision is not freely and voluntarily made (§ 261.6). A selection by the victim of the lesser of two evils—rape versus the violence threatened by the attacker if the victim resists—is hardly an exercise of free will. (See *People v. Lay* (1944) 66 Cal.App.2d 889, 893 [153 P.2d 379].)

(a)(1) of section 261 proscribes sexual intercourse with a person who lacks the capacity to give legal consent due to a mental disorder or a developmental or physical disability.[4]

That distinction determines the instructions that are relevant to the charge. A charge that the defendant accomplished the act of sexual intercourse against the will of the victim, together with evidence that places in dispute the willingness of the victim to engage in intercourse, entitles the defendant to an instruction that the act was not criminal if it was committed with the victim's actual consent. (See, e.g., CALJIC Nos. 10.00 & 1.23.1.) But if the charge is that the victim lacked the capacity to give legal consent (such as § 261, subd. (a)(1)), then actual consent is irrelevant, and the jury instructions need not touch on that issue (see CALJIC No. 10.02).

 2. *Section 261(a)(3), Proscribes Sexual Intercourse with Persons Who Lack the Capacity to Give Legal Consent Due to Intoxication.*

Unlike subdivisions (a)(2), (a)(6), and (a)(7) of section 261, section 261(a)(3) is not phrased in terms of the victim's "will." Nor does it employ the words "legal consent," as does subdivision (a)(1). Instead, section 261(a)(3) speaks in terms of the victim being "prevented from resisting . . . ."[5] Does that subdivision pertain to the victim's actual consent or to the victim's ability to give legal consent?

Although the language of section 261(a)(3) suggests that the victim's actual consent is at issue, our Supreme Court long ago rejected that notion. In discussing the elements of rape of a mentally incompetent person (§ 261, former subd. 2, now subd. (a)(1)), the court said: "In this species of rape neither force upon the part of the man, nor resistance upon the part of the woman, forms an element of the crime. If, by reason of any mental weakness, she is incapable of legally consenting, resistance is not expected any more than it is in the case of one who has been drugged to unconsciousness, or *robbed of judgment by intoxicants*." (*People v. Griffin, supra*, 117 Cal. at p.

---

[4]Both types of consent are lacking in the case of an unconscious or sleeping victim. (§ 261, subd. (a)(4)(A).) While in that state, the victim not only lacks the capacity to give legal consent, he or she cannot possibly give actual consent.

[5]The phrase dates from the original Penal Code of 1872, when the subdivision dealt with two types of rape: "Where she is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution, or by any intoxicating narcotic, or anesthetic, substance, administered by or with the privity of the accused . . . ." (§ 261, former subd. 4.) The reference to threats was removed in 1980 (Stats. 1980, ch. 587, § 1, p. 1595), but the "prevented from resisting" language was retained. The relevant subdivision now provides that a rape is committed "[w]here a person is prevented from resisting by an intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused." (§ 261(a)(3).)

585, italics added; *People v. Boggs* (1930) 107 Cal.App. 492, 495 [290 P. 618].)

This emphasis on the effect of the intoxicants on the victim's powers of judgment rather than the victim's powers of resistance is consistent with the Model Penal Code, which provides that actual consent is not legal consent if "it is given by a person who by reason of youth, mental disease or defect, or intoxication is manifestly unable or known by the actor to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct . . . ." (Model Pen. Code, § 2.11, subd. (3)(b).)

We conclude that, just as subdivision (a)(1) of section 261 proscribes sexual intercourse with a person who is not capable of giving legal consent because of a mental disorder or physical disability, section 261(a)(3) proscribes sexual intercourse with a person who is not capable of giving legal consent because of intoxication. In both cases, the issue is not whether the victim actually consented to sexual intercourse, but whether he or she was capable of exercising the degree of judgment a person must have in order to give legally cognizable consent.

In reaching that conclusion, we reject the defendant's contrary, more literal construction of section 261(a)(3). He notes that, prior to a 1980 amendment, the rape-by-force subdivision of section 261 expressly required evidence of resistance by the victim. (Compare former subd. 2 of § 261 in Stats. 1979, ch. 994, § 1, p. 3383, with amended version in Stats. 1980, ch. 587, § 1, p. 1595.) Resistance was required to provide "an objective indicator of nonconsent," corroborating the victim's testimony that the act of intercourse was undertaken against the victim's will. (*People v. Barnes* (1986) 42 Cal.3d 284, 299 [228 Cal.Rptr. 228, 721 P.2d 110]; *People v. Cicero, supra,* 157 Cal.App.3d at p. 480.) In accordance with that purpose, the degree of resistance required "was only that which would reasonably manifest refusal to consent to the act of sexual intercourse." (*Barnes,* at p. 297.) The defendant asserts that, with that understanding of "resistance," it follows that "prevented from resisting" in section 261(a)(3) means that the victim is so intoxicated that he or she was physically incapable of manifesting a refusal to actually consent.

That construction is untenable. The case law interpreting the former resistance requirement demonstrates that the exertion of physical force by the victim against the defendant was not required; verbal protestations alone were sufficient to establish resistance. (See, e.g., *People v. Peckham* (1965) 232 Cal.App.2d 163, 165-168 [42 Cal.Rptr. 673]; *People v. Austin* (1961) 198 Cal.App.2d 669, 673-675 [18 Cal.Rptr. 209]; *People v. Cook* (1935) 10 Cal.App.2d 511, 512-516 [52 P.2d 538].) Therefore, to be intoxicated to a

degree that rendered the victim physically unable to resist would mean that the victim was unable to even speak. The line between that extreme level of intoxication and absolute unconsciousness is very thin. There is no indication in our decisional law that section 261(a)(3) has ever been interpreted to apply only to such severely incapacitated victims.

For instance, the evidence in *People v. Ing* (1967) 65 Cal.2d 603 [55 Cal.Rptr. 902, 422 P.2d 590] was that the defendant, a medical doctor, had administered injections to the victim on several occasions; that after receiving the shots, the victim felt " 'light-headed' " and " 'just didn't care about anything' " (*id.* at p. 607); that the doctor would then have intercourse with her; and that she would not have engaged in intercourse with him had she not been under the influence of the drugs (*ibid.*). There was apparently no evidence that the victim was unable to speak or otherwise communicate a refusal to consent; indeed, the evidence suggested that the victim actually consented to intercourse. Nevertheless, the court summarily rejected the defendant's contention that the evidence was insufficient to support his rape convictions. (*Id.* at p. 612.)

In another case against a medical doctor, the victim testified that she went to the defendant for treatment of a suspected illness. (*People v. Wojahn* (1959) 169 Cal.App.2d 135, 139 [337 P.2d 192].) He had her disrobe and gave her a shot and a capsule to swallow. (*Ibid.*) "Thereafter she was unable in standing against a wall with her eyes closed to touch her nose with her fingers. She felt light and relaxed, her feet felt glued to the floor, and she felt as though her body were swaying. She detailed his actions, which culminated in one or more acts of sexual intercourse with her. She became frightened and dizzy and almost blacked out." (*Ibid.*) She did not consent to the intercourse. (*Ibid.*) The court found that there was sufficient evidence to support the guilty verdict. (*Id.* at p. 141.)

Similarly, after ingesting an unspecified drug in a glass of wine at a restaurant, the victim in *People v. Crosby* (1911) 17 Cal.App. 518 [120 P. 441] walked with the defendant several blocks and up a flight of stairs to a rooming house, waited while the defendant registered for a room, and climbed another flight of stairs with the defendant and the landlord. (*Id.* at p. 521.) She knew that it was "wrong and improper" to accompany the defendant into the room and told him so. (*Id.* at pp. 521, 523.) Nevertheless, she did not call for assistance from the patrons in the restaurant, pedestrians on the streets, or the landlord because the drug made her feel weak and dizzy, and she " 'didn't know half the time what [she] was doing' " (*id.* at p. 523). The court stated in dicta that the evidence would have been sufficient to uphold the jury's verdict had that verdict not been tainted by prosecutorial misconduct. (*Id.* at p. 524.)

In none of these cases did the courts either discuss the meaning of the phrase "prevented from resisting" or expressly address the sufficiency of the evidence to establish that the victims had been prevented from resisting. However, the fact patterns in those cases are inconsistent with an interpretation of section 261(a)(3) that would require the victims to be so intoxicated that they are physically incapable of either speaking or otherwise manifesting a refusal to give actual consent. Instead, they support the conclusion that the statute requires only that the level of intoxication be such that the victim is incapable of exercising the judgment required to decide whether to consent to intercourse.

Because section 261(a)(3) proscribes sexual intercourse with a person who is not capable of giving legal consent because of intoxication, the lack of actual consent is not an element of the crime. Accordingly, the trial court properly denied the defendant's request for an instruction to the contrary.

**B.** *The Trial Court Prejudicially Erred by Failing to Explain to the Jury the Meaning of "Prevented from Resisting."*

■ In accordance with CALJIC No. 10.02, the jury was instructed that one of the elements of rape by intoxication was that "[t]he alleged victim was prevented from resisting the act by an intoxicating substance . . . ." In an apparent reference to that instruction, after several hours of deliberation the jury asked the court for the legal definition of "resistance." The defendant contends that the trial court erred in responding to that request. The People argue that the issue has been waived and that in any event there was no error.

**1.** *The Defendant Did Not Waive His Request for a Different Definition.*

In response to the jury's request for further instruction, and with the agreement of defense counsel, the trial court instructed the jury that "[t]his is an area in which you must use your common sense and experience to determine the everyday meaning of resistance." Sensing that the jury was dissatisfied with that response, the trial court told the jury that counsel would research the matter overnight "to determine whether we can get a definition that might be a little more satisfactory."

The next morning, defense counsel proposed instructing the jury that resistance is "the application of force . . . to thwart off another force." The trial court declined to do so, stating: "I think upon further reflection that I'm just going to stick with the definition we gave them yesterday. . . . I think

it is a common sense and common experience decision, and I'm going to leave it at that. And I'm simply going to go in and tell the jury, unless I hear objection, that they must deal with the definition we've provided them yesterday." Defense counsel responded by saying "Very well."

Focusing on the trial court's last sentence and defense counsel's response, the People argue that the defendant waived any objection by failing to renew his request for a different instruction. We disagree. The defendant had requested a particular instruction, and the trial court had denied that request. Nothing further is necessary to preserve the issue for appellate review. When the complete exchange between the court and defense counsel is read in context, it cannot reasonably be construed as a withdrawal of the defendant's request for a different definition.

### 2. The Trial Court Erred by Failing to Define "Prevented from Resisting" in This Context.

The trial court has a duty to help the jury understand the legal principles the jury is asked to apply. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].) In particular, under section 1138 the court must attempt "to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212 [275 Cal.Rptr. 729, 800 P.2d 1159].) But "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*Beardslee*, at p. 97; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1331 [52 Cal.Rptr.2d 256].) In exercising that discretion, the trial court "must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Beardslee*, at p. 97; *Moore*, at p. 1331.)

The defendant contends that the trial court erred in failing to instruct the jury as to the meaning of "prevented from resisting." He is correct.

CALJIC No. 10.02 describes the elements of rape by intoxication in language substantially identical to that of section 261(a)(3). "The language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the

defendant fails to request amplification." (*People v. Poggi* (1988) 45 Cal.3d 306, 327 [246 Cal.Rptr. 886, 753 P.2d 1082].) But that general rule does not apply " 'when the jury would have difficulty in understanding and applying the statute. Under such circumstances, a court must give additional guidance and clarification on its own motion.' " (*People v. Rogers* (1971) 5 Cal.3d 129, 138 [95 Cal.Rptr. 601, 486 P.2d 129], quoting *People v. Graham* (1969) 71 Cal.2d 303, 329 [78 Cal.Rptr. 217, 455 P.2d 153].)

▮▮ Here, instruction in the language of the statute was not sufficient. As demonstrated by its request for a definition of "resistance," the jury was having difficulty grasping the import of the statutory language, and understandably so. The meaning of "prevented from resisting" in this context is not clear. As we explained in part A of this opinion, although the statutory language suggests that the factual issue is whether the intoxicating substance prevented the victim from physically resisting, the correct interpretation focuses on whether the victim's level of intoxication prevented him or her from exercising judgment.

The defendant was entitled to have that concept correctly explained, especially after the jury requested clarification of that very subject. In particular, the jury should have been instructed that its task was to determine whether, as a result of her level of intoxication, the victim lacked the legal capacity to give "consent" as that term is defined in section 261.6. Legal capacity is the ability to exercise reasonable judgment, i.e., to understand and weigh not only the physical nature of the act, but also its moral character and probable consequences. (Cf. *People v. Griffin, supra*, 117 Cal. at p. 585; *People v. Boggs, supra*, 107 Cal.App. at p. 495; *People v. Peery* (1914) 26 Cal.App. 143, 145 [146 P. 44].)

▮▮ In deciding whether the level of the victim's intoxication deprived the victim of legal capacity, the jury shall consider all the circumstances, including the victim's age and maturity. (Cf. *People v. Young* (1987) 190 Cal.App.3d 248, 257 [235 Cal.Rptr. 361].) It is not enough that the victim was intoxicated to some degree, or that the intoxication reduced the victim's sexual inhibitions. "Impaired mentality may exist and yet the individual may be able to exercise reasonable judgment with respect to the particular matter presented to his or her mind." (*People v. Peery, supra*, 26 Cal.App. at p. 145; accord, *People v. Griffin, supra*, 117 Cal. at p. 585.) Instead, the level of intoxication and the resulting mental impairment must have been so great

that the victim could no longer exercise reasonable judgment concerning that issue.[6]

■ The trial court's response to the jury's inquiry did not help the jury to focus on the victim's ability to exercise that judgment. To the contrary, by instructing the jury "to determine the everyday meaning of resistance," the trial court erroneously implied that the meaning of the statute could be deciphered by giving the language of the statute its common meaning, and thus that the issue was the victim's ability to resist.

We are sympathetic to the quandry in which the trial court was placed. Its reluctance to vary from the statutory language or the standard jury instructions is understandable, particularly in light of the absence of any prior case law directly interpreting the phrase at issue. "[C]omments diverging from the standard are often risky." (*People v. Beardslee, supra*, 53 Cal.3d at p. 97.) But the unfortunate fact that it is difficult to determine the meaning of section 261(a)(3) only serves to explain how the error occurred; it does not render it any less erroneous.

### 3. *The Error Is Prejudicial.*

■ As with any other instructional error, a "violation of section 1138 does not warrant reversal unless prejudice is shown." (*People v. Beardslee, supra*, 53 Cal.3d at p. 97.) This error did prejudice the defendant because the evidence supports conflicting conclusions regarding the victim's capacity.

Norliza G. (Norliza) lived with her mother and stepfather, the defendant. On December 27, 1996, Norliza's friend, the victim, was spending the night at Norliza's house. The victim had recently turned 16 years old.

The victim testified that, on December 27, she consumed a single drink of bourbon over ice that the defendant had poured for her. She variously described the drink as filling a 12-inch-tall glass "a little more than half-way," and as being in a glass "a couple inches taller than a coke can" filled to a level "a little more than half of a coke can." Norliza testified that the victim had two drinks, the first poured by the defendant and the second poured by the victim herself. Norliza estimated the total amount of bourbon consumed by the victim to be five ounces.

---

[6] In one sense, a minor is always legally incapable of giving consent. (See § 261.5 [unlawful sexual intercourse with a minor].) But here the defendant was being prosecuted not only for unlawful sexual intercourse but also for the greater crime of rape by intoxication. In that event, the jury must set aside the statutory presumption that a person under 18 years of age is incapable of giving legal consent and must determine whether the elements of the more serious crime are met. (Cf. *People v. Young, supra*, 190 Cal.App.3d at p. 257 [whether defendant committed only unlawful sexual intercourse or forcible rape as well].)

According to the victim, she felt "[w]oozy, very light headed" after consuming the alcohol. She slipped and fell while walking in the living room of the defendant's house. Explaining that the victim had not had anything to eat, Norliza testified that the victim became "very giggly," slurred her speech, could not walk straight, and generally "wasn't altogether there." Norliza saw her fall several times. Thomas Lyles testified that the victim appeared to be "kind of tipsy" and later was clumsy and obviously intoxicated. However, she was never so intoxicated that she was close to passing out, that she did not know what she was doing, or that she could not physically resist.

The victim testified that she then walked into a room where the defendant and Lyles, his friend, were working on a computer. On a laptop computer they were playing a pornographic CD depicting men and women engaging in sexual acts. The defendant told the victim, "I want to see you play with yourself." Other witnesses testified that, upon seeing the activity depicted on the computer screen, the victim volunteered, "I can do that," to which the defendant responded, "Well, show me."

The victim testified that her "judgment was not there." Without objecting, she pulled down her jeans and panties to below her knees, lay on the floor, and masturbated for three minutes. Thereafter, Norliza helped the victim pull up her clothes. She did not need Norliza's help, but she was "wobbly."

After the victim had walked from the computer room to the kitchen, the defendant invited her to follow him and said that he would either take some pictures of her or show some pictures to her. She walked down the hall and into the master bedroom. Once in the bedroom, the defendant dropped to his knees and touched her breast by pushing his hand under her shirt and bra. She pushed his hands down and told him, "No, Mark," because she did not want him to do that.

The victim testified that the defendant then stood, picked up the victim, and set her on the foot of the waterbed. He pulled her pants and underwear down to her ankles, and pushed up her top and bra, exposing her breasts. She tried to sit up, but the alcohol caused her to fall back onto the bed. The defendant then orally copulated her for 10 minutes. He then removed her shoes and pants, as well as his own clothes, and handcuffed her with her hands behind her head. She complained to him that the handcuffs were too tight and that they hurt her wrists. He then engaged in sexual intercourse. He got up and put on his clothes when Norliza knocked on the door to the bedroom and said that her mother would be home soon. Both the defendant and the victim walked out of the bedroom. The defendant denied undressing the victim or himself, or engaging in any sexual acts in the bedroom.

Lyles and the defendant said that they needed to get the victim out of the house to sober her up. She told the defendant that she did not want to leave the house, but he pulled her by the arm to his car. Lyles was with them. She was still feeling "woozy but a little more there" than earlier. In Lyles's view, she was "tipsy," and her level of intoxication was getting progressively worse. While in the car she was smoking a cigarette but dropped it after burning a hole in the headliner of the car.

The defendant stopped at a Motel 6 and rented a room. The victim stepped out of the car and the three of them climbed the stairs to the third floor motel room. Because she was so intoxicated, Lyles and the defendant were holding her by each arm to assist her up the stairs. Despite their help, as a result of the alcohol she tripped and fell on her knees near the top of the stairs. The defendant's testimony characterized her as being "pretty giddy" at this point.

The victim testified that, once in the motel room, she walked into the bathroom, disrobed, and started to take a shower. The defendant pulled her out of the shower, saying "we don't have time for this." The victim began to get dressed. She sat on the floor because she was too intoxicated to put on her pants while standing.

The victim testified that after she had put on only the shirt, the defendant called to her. She came out of the bathroom to find both men naked. She began walking toward the door, and said, "I thought we were going home?" Lyles initially testified that she said something about wanting to go home, but later testified that she said "Let's get some liquor and have sex all night." Similarly, the defendant testified that as soon as she had disrobed, she came out of the bathroom and climbed onto one of the beds.

The victim testified that, in response to her comment about going home, the defendant said, "No. I want you to ride Tom." The defendant then pulled the victim by the arm on top of Lyles, who was lying down. While engaging in intercourse with Lyles, the defendant told her, "I want you to suck me." She then began to orally copulate the defendant. The defendant then took the victim to the other bed and pulled her on top of him. While engaging in intercourse with the defendant, the victim orally copulated Lyles. She testi-fied that, during this time, she "was conscious a little bit." She felt like she "was just doing what they were saying to do."

The defendant then turned the victim on her back and again engaged in intercourse. While in that position, the defendant took a bottle of Rush (amyl nitrite inhalant), poured some onto a washcloth, and put it over the victim's face. She tried to hold her breath and push his hands away. Lyles recalled that she also told the defendant to stop applying it to her face.

After the defendant ejaculated, he got up, started to dress, and instructed the victim to do the same. She was able to dress herself. As she was walking out, she still felt wobbly and light-headed, but she walked down the stairs without assistance. The defendant drove her to the corner of the block on which he lived and she walked the rest of the way to Norliza's house. According to Norliza, when the victim returned to the house, she had "sobered up a lot" and "wasn't drunk anymore."

The victim testified that she did not resist the defendant's actions that night because he was a lot bigger than she was, because she was afraid of him, and because she was intoxicated. Lyles testified that she never said she did not want to have sex. She never said "no," "don't," "stop," or anything else indicating that she did not consent. To the contrary, she said that she wanted to engage in sexual relations. According to the defendant, it did not appear that the victim was so drunk that she did not know what she was doing or that "she was prevented mentally from resisting."

The victim spent that night and the next day with Norliza at the defendant's house. At no time did she display any animosity toward Lyles or the defendant or express any displeasure to the defendant concerning the events of the prior evening.

Whether the victim possessed sufficient mental capacity to give legal consent despite her intoxication is a question of fact for the jury. (*People v. Griffin, supra,* 117 Cal. at p. 585.) Here, there is evidence from which the jury could have concluded that the victim was not capable of exercising reasonable judgment, but there is also evidence from which it could have concluded that she was capable. She voiced her objections both to leaving the house and to inhaling the Rush. Although unsteady on her feet, the victim was able to walk and to undress herself. To Lyles and the defendant, she appeared in the motel to be sober enough to make decisions. Shortly after engaging in the intercourse found by the jury, she dressed herself and walked down several flights of stairs unassisted. When she returned to the house, she was not drunk. And the next day, after she presumably was utterly sober, she amicably associated with both the defendant and Lyles without indicating in any fashion that she would have made different decisions the night before had she not been under the influence of alcohol.

In short, there is substantial evidence both that the victim actually consented and that she possessed the legal capacity to do so. There being evidence from which the jury could have concluded that the victim was not so intoxicated that she was deprived of the ability to exercise reasonable judgment, the trial court's erroneous failure to properly instruct the jury

concerning the elements of section 261(a)(3) cannot be deemed to have been harmless. The conviction on counts 2 through 5 must be reversed.

C. *An Honest and Reasonable but Mistaken Belief That a Sexual Partner Is Not Too Intoxicated to Give Legal Consent to Sexual Intercourse Is a Defense to Rape by Intoxication.*

 In accordance with our obligation to give guidance to the trial court in the event of a retrial (Code Civ. Proc., § 43), we consider another issue concerning the validity of the defendant's convictions of rape by intoxication: whether an honest and reasonable but mistaken belief that a sexual partner is not too intoxicated to give legal consent is a defense.

A defendant's honestly and reasonably held but erroneous belief that the victim actually consented to sexual intercourse is a defense to a charge of forcible rape. (*People v. Williams* (1992) 4 Cal.4th 354, 360-361 [14 Cal.Rptr.2d 441, 841 P.2d 961]; *People v. Mayberry, supra*, 15 Cal.3d at p. 155.) The defendant contends that the trial court should have given a *Mayberry* instruction. (CALJIC No. 10.65.)

His precise contention is incorrect. Because, as explained in part A, *ante*, the actual consent of the victim is not a defense to a charge of rape by intoxication, a belief in the existence of such actual consent is irrelevant.

Similar to the rule of *People v. Mayberry* but focused on legal consent rather than actual consent is the rule that a defendant's actual and reasonably held but erroneous belief that the victim was old enough to give legal consent to sexual intercourse is a defense to unlawful sexual intercourse with a minor. (*People v. Hernandez, supra*, 61 Cal.2d at pp. 535-536; CALJIC No. 10.67.) We construe the defendant's contention broadly to include both varieties of mistake of fact instructions.

The Supreme Court explained in *People v. Hernandez* that, unless the particular criminal statute at issue expresses a legislative intent or policy to impose strict criminal liability, a defendant's conduct is punished as a crime only if it was committed with the necessary criminal intent. (61 Cal.2d at pp. 532-533.) "There can be no dispute that a criminal intent exists when the perpetrator proceeds [to engage in sexual intercourse] with utter disregard of, or in the lack of grounds for, a belief that the female has reached the age of consent. But if he participates in a mutual act of sexual intercourse, believing his partner to be beyond the age of consent, with reasonable grounds for such belief, where is his criminal intent?" (*Id.* at p. 534.) The court concluded that a reasonable and "bona fide but erroneous belief that a

valid consent to an act of sexual intercourse has been obtained" is a defense to a charge of statutory rape. (*Id.* at p. 535.)

The same reasoning controls when the sexual partner's consent is invalid because of a lack of capacity due to brain damage rather than minority. (*People v. Dolly* (1966) 239 Cal.App.2d 143, 146 [48 Cal.Rptr. 478] [dicta].) It also controls in this context, in which the lack of capacity is due to intoxication. As section 261(a)(3) itself provides, the accused is guilty only if the victim's incapacitating level of intoxication "was known, or reasonably should have been known by the accused." An honest and reasonable but mistaken belief that a sexual partner is not too intoxicated to give legal consent to sexual intercourse is a defense to rape by intoxication.

D.-F.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The convictions on counts 2, 3, 4, 5, and 11 are reversed. The order of compensatory restitution is reversed. All other aspects of the judgment are affirmed. The trial court is directed to determine the compensatory restitution due in accordance with section 1202.4, subdivision (f).

Hollenhorst, Acting P. J., and Gaut, J., concurred.

---

*See footnote, *ante*, page 454.