Filed 3/7/24; On remand

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060049 |
| v. | (Super. Ct. No. B1366626) |
| RODNEY TAUREAN LEWIS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Santa Clara County, Vincent J. Chiarello, Judge. Affirmed.

Swanson & McNamara, Edward W. Swanson and August Gugelmann for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Alice B. Lustre, Lisa Ashley Ott, and Arthur P. Beever, Deputy Attorneys General, for Plaintiff and Respondent.

The jury convicted Rodney Taurean Lewis of rape by an intoxicating substance (Pen. Code, § 261,[1] subd. (a)(3), count 1), and kidnapping to commit rape (§ 209, subd. (b)(1), count 2). The trial court sentenced Lewis to eight years on count 1 and a consecutive term of seven years to life on count 2.

In *People v. Lewis* (2021) 72 Cal.App.5th 1, 16-18, the majority concluded the traditional force element for kidnapping applied to an intoxicated adult. It reversed count 2 because the trial court erroneously instructed the jury kidnapping could be accomplished by "deception," and the error was prejudicial. The majority concluded that since there was no evidence of force, Lewis could not be retried on count 2. (*Id.* at pp. 18-19.) Because of this conclusion, it did not address Lewis's remaining sufficiency of the evidence contentions regarding count 2. (*Id.* at p. 18.) The dissenting justice concluded the instruction was not defective, and even if it was, the error was harmless. (*Id.* at p. 32 (dis. opn. of Bedsworth, J.).) All three justices concluded sufficient evidence supported count 1. (*Id.* at pp. 21, 23 (dis. opn. of Bedsworth, J.).)

In *People v. Lewis* (2023) 14 Cal.5th 876, 884 (*Lewis*), our Supreme Court reversed. The court opined the relaxed force standard applicable to children (i.e., the use of deception rather than actual force) applies to incapacitated adults. (*Id.* at p. 895.) Assuming without deciding the trial court erred in instructing the jury on deception, the *Lewis* court concluded the instructional error was harmless. (*Id.* at p. 883.) The court remanded the case to this court to address Lewis's unresolved sufficiency of the evidence arguments. (*Id.* at p. 903.)

As we explain below, sufficient evidence supports Lewis's convictions on counts 1 and 2. We affirm the judgment.

---

[1] All further statutory references are to the Penal Code.

FACTS

I.  *Prosecution Evidence*

Twenty-two-year-old S.D. and D.L. had just started dating.  S.D. invited him over for dinner where they drank a bottle of wine.  After dinner, they went to Rudy's Pub, arriving about 11:00 p.m.  S.D. did not feel intoxicated.

D.L. bought S.D. an alcoholic drink that she consumed about one-third of because it was too strong—it had roughly four shots of alcohol.  S.D., who now felt tipsy, danced with D.L.  When D.L. went to the restroom, S.D. went to get her cell phone from her purse, but it was gone.

As S.D. searched for her phone, Lewis approached her and asked what she was doing.  S.D. said she had lost her phone.  Lewis told S.D. that his friend had found a phone.  Lewis said he would call the friend, and he put his own phone to his ear. (Lewis's cell phone records do not reflect any calls at that time.)  Lewis suggested they have a drink while they waited for his friend to return to Rudy's.  S.D. stated, "From this point on, I don't really remember clearly."  S.D. took Zoloft once a day; she did not take Xanax (alprazolam).

Although S.D. did not remember what happened, Rudy's video surveillance[2] and witness testimony helped explain what transpired next.  S.D. and Lewis first appear in the video on the right side of the screen as they reached the bar at 12:37 a.m.  Lewis ordered two Long Island iced teas and one shot of tequila.  Lewis pulled out his phone and held it to his ear.  D.L. approached the bar, stood behind Lewis and S.D., and talked with other patrons.  At the same time, S.D. kissed Lewis and held his hand. Their flirtation appeared to be reciprocal.

---

[2]  The video was played for the jury.

When the drinks arrived, Lewis slid one of the Long Island iced teas and the tequila shot to S.D. She drank the shot and sipped the mixed drink. As they drank and talked, D.L. danced nearby with some other women.

Minutes later, Lewis ordered two shots of tequila. Bartender Erica Weston had training and experience recognizing the physical signs of intoxication and noticed S.D. "swerving" and "leaning on the bar." Although S.D. did not look "completely out of control," Weston believed she was unaware how impaired she was and feared she or someone else might get hurt. Weston told Lewis that she was not going to serve S.D. more alcohol. Lewis angrily threatened to get her fired, and then said the drinks were for another friend. Weston poured two shots of tequila and set them on the bar.

Around this time, D.L. tapped S.D. on the shoulder. She turned around to talk to him and handed him the Long Island iced tea. D.L. testified he was intoxicated, but he believed S.D. was not so intoxicated that she could not walk or speak. While D.L. and S.D. were talking, Lewis turned and spoke to D.L. briefly. After Lewis turned back toward the bar and paid for the drinks, he positioned himself between D.L. and S.D., who also turned toward the bar. Weston slid the shots toward Lewis and turned away to serve other customers.

S.D. and Lewis drank their shots. Lewis took S.D.'s hand, put his arm around her back, and began to guide her away from the bar. S.D. placed her arm around his back momentarily. Lewis freed his arm from S.D., leaned toward D.L., and spoke to him. S.D. turned slightly toward the bar and leaned on it.

Lewis again took S.D.'s hand, put his arm around her back, and began to usher her away from the bar. S.D. stepped away from Lewis and walked ahead of Lewis across the dance floor through the crowd. Lewis followed. As they walked by and away from D.L., he talked with a male patron. D.L. tried following them, but Rudy's was so crowded he was unable to do so. S.D. and Lewis left Rudy's around 12:45 a.m.

4

The next morning, a woman found S.D., unconscious and wrapped in a blanket, lying on a plant median in a park. When the woman could not get S.D. to respond, she called 911.

Paramedic Maxwell Magnus arrived and found S.D. unconscious. Magnus pulled the blanket back and saw S.D.'s underpants were "partly pulled down." When Magnus asked how much she had to drink, S.D. detailed being at a bar, having a glass of wine, losing her cell phone, and a man telling her that he knew where her phone was. She could not say how the evening ended. S.D. eventually agreed to go to the hospital.

Officer Sean Downey arrived. S.D. was unresponsive and dazed, and her eyes were "glassy." He went to the hospital to speak with S.D. At the hospital, a sexual assault response team nurse (Nurse) examined S.D. and took blood and urine samples. S.D. told the Nurse that she lost her memory and thought she had sex because it "hurt[] inside [her] vagina." S.D. had bruises on her arms and legs and abrasions on her lower back and feet. She had redness and swelling in her labia minora and a laceration to her posterior fourchette. The Nurse concluded S.D.'s injuries were consistent with her belief she had sex but not necessarily indicative of sexual assault.

Downey noticed S.D. became more lucid and responsive during the exam. As her condition improved, S.D. remembered more of the previous night. She told Downey that she had dinner with her boyfriend, drank two glasses of wine, and went to a bar with him. At the bar, she got separated from her boyfriend, she lost her cell phone, a man told her that his friend had her phone, and the man appeared to make a call. The man suggested they have a drink before they got her phone, and she agreed. She told Downey "she [didn't] have much memory after she left the bar." Downey believed S.D. was under the influence of alcohol and a drug.

S.D.'s urine contained alprazolam, an oral depressant used to treat anxiety that can cause fogginess or memory problems. An expert testified its effects are "enhanced" if it is combined with alcohol. He said alprazolam's effects typically take

5

about 30 minutes to appear but when combined with alcohol it could be quicker and its effects are "enhanced."

A sample of S.D.'s blood taken around 11:00 a.m. had a blood-alcohol concentration (BAC) of 0.18 percent. Another expert estimated S.D.'s BAC at 1:45 a.m. was 0.35 percent, and within a range of 0.32 to 0.41 percent. That level of intoxication was considered phase IV, where a person could pass out. On cross-examination, Lewis's trial counsel presented the expert with a hypothetical using S.D.'s weight and an estimate of the amount of alcohol she consumed. The expert opined that at 1:45 a.m. the person's BAC would be about 0.13 percent. The expert agreed mixing alcohol with alprazolam had an enhanced effect.

Detective Anjanette Holler led the investigation. Holler traced S.D.'s cell phone to a location near Rudy's. She went to Rudy's and met with the owner, who gave her the phone, surveillance video, and credit card receipts that led her to Lewis.

Police officers went to D.L.'s house and spoke to him. D.L. said they had dinner, shared a bottle of wine, and went to Rudy's about 11:15 p.m. He bought two "Adios Mother Fuckers" drinks, but S.D. drank only one-third of hers. They danced, she lost her cell phone, and they looked for it. He went to the restroom, and when he returned, he found her at the bar with another man. D.L. spoke to S.D. and the man, but he could not remember what was said. At some point, he realized S.D. was gone. He took a taxi to S.D.'s house and slept in his car. He drove home around 7:30 a.m., about an hour before police arrived to speak with him.

Holler learned where Lewis lived and she spoke with him five days after the incident.[3] Lewis stated he met S.D. when she asked him if he found her cell phone. He told her "he thought maybe he knew somebody that may have found a phone." While standing at the bar, he realized she was "pretty drunk." He left with her because he

---

[3] The interview was played for the jury.

6

thought he could help her find her phone. In the parking lot, S.D. asked and he agreed to drive her home. On the way to her home, she would "pass out" intermittingly and at one point "start[ed] freaking out" and asked to get out of the car. He exited the freeway and dropped her off at an apartment complex near a park. S.D. rebuffed his offer to drive her home, and Lewis gave S.D. her shoes and purse, and a blanket he had in his car. Lewis denied having sex with S.D. Holler served Lewis with a search warrant to obtain his DNA. Lewis then admitted to having sex with S.D. in his car. Lewis said they were in the car for about 45 minutes, and she was "awake" and "willing." Lewis's DNA did not match any evidence in the case.

Holler obtained Lewis's cell phone records. An expert described Lewis's location based on them. Lewis did not make a call while he was at Rudy's. Two calls within 30 minutes of Lewis and S.D. leaving Rudy's indicated Lewis drove north to near his home. The phone records were inconsistent with Lewis having traveled from Rudy's south to the park.

Holler arrested Lewis. In his home, Holler found hydrocodone in Lewis's name, and "a knockoff version of Viagra" in a safe. Holler did not find any alprazolam, but opined it was "very easy to obtain." She said alprazolam is often put into an alcoholic drink to mask its taste.

## II. Defense Evidence

Lewis testified he did not clearly remember what happened at Rudy's. He arrived at Rudy's about 10:45 p.m. to meet a friend, who never arrived. He had several drinks before meeting S.D., who appeared to be looking for something. Lewis asked her what she was looking for, and she said her cell phone. Lewis told her that he thought he saw someone pick up something. He denied saying his friend picked up her phone or he would help her find her phone. When he held his phone to his head, he was trying to send a voice text message to his friend. Lewis bought S.D. a shot and a Long Island iced tea. He ordered two more shots. He did not remember the bartender refusing to serve

7

S.D.  Lewis and S.D. walked outside, and he offered to drive her home.  He did not think they discussed her phone.  Lewis was intoxicated and believed S.D. was intoxicated as well.  Lewis also offered to give D.L. a ride home, but S.D said no.

While Lewis drove her home, they flirted.  S.D. rubbed his leg and he reciprocated.  Lewis stopped the car, and they kissed.  S.D. tried to straddle Lewis in the driver's seat but could not.  Lewis slid under S.D. in the passenger seat.  They had protected sexual intercourse, and he thought he ejaculated.  Lewis returned to the driver's seat and drove south to take her home.  He said they were both intoxicated.  S.D. appeared to be nodding off and then abruptly asked Lewis to let her out.  Lewis exited the freeway and despite not wanting to abandon her, he let her out and gave her a blanket.  Lewis drove home.

Lewis admitted he initially lied to Holler about having sexual intercourse with S.D.  Lewis did not think he had done anything wrong, but he did not want his wife to learn he cheated.  Lewis believed S.D. was capable of consenting to having sexual intercourse, and he did not intend to rape her.  Lewis denied kidnapping S.D., and noted she was ahead of him as they walked out of Rudy's and he did not force her into his car.  He did not take her to his home or the park.  He denied having a prescription for, possessing, or giving alprazolam to S.D.  Lewis's wife testified neither Lewis nor she had ever had a prescription for alprazolam or possessed it without a prescription.

As to count 2, the trial court instructed the jury with a combination of CALCRIM No. 1201, "Kidnapping:  Child or Person Incapable of Consent," and CALCRIM No. 1203, "Kidnapping:  For Robbery, Rape, or Other Sex Offenses."  The instruction provided the following:  "1.  The defendant intended to commit rape of a woman while intoxicated; [¶] 2.  Acting with that intent, the defendant used physical force or *deception* to take and carry away an unresisting person with a mental impairment; [¶] 3.  Acting with that intent, the defendant moved the person with a mental impairment a substantial distance; [¶] . . . [¶] *Deception* includes tricking the mentally

8

impaired person into accompanying him or her a substantial distance for an illegal purpose." (Italics added.) The court overruled Lewis's objection to inclusion of "deception."

DISCUSSION

I. *Count 1—Rape by an Intoxicating Substance*

Lewis argues there was insufficient evidence S.D.'s level of intoxication rendered her incapable of exercising the reasonable judgment to decide whether to consent to sexual intercourse. We disagree.

""""In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility."' [Citation.]" (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117-1118 (*Ramirez*).)

Under section 261, subdivision (a)(3), rape is committed when a defendant engages in an act of sexual intercourse where the victim "[is] prevented from resisting by an intoxicating . . . substance, . . . and this condition was known, or reasonably should have been known by the accused." The victim's intoxication level must "be such that the victim is incapable of exercising the judgment required to decide whether to consent to intercourse." (*People v. Giardino* (2000) 82 Cal.App.4th 454, 464.)

9

Here, there was substantial evidence to support the jury's conclusion S.D.'s intoxication level prevented her from exercising the judgment to decide whether to consent to having sexual intercourse with Lewis. There was evidence S.D.'s BAC was 0.18 percent at 11:00 a.m. the next morning and she had alprazolam in her system. The expert testified her BAC would have been about 0.35 percent an hour after she left Rudy's with Lewis. The expert also testified alprazolam would have compounded the alcohol's effects, leading to significant cognitive and physical impairment. Weston's and Lewis's testimony supports the conclusion S.D.'s intoxication level impaired her judgment. Weston, the bartender who was adept at recognizing signs of intoxication, refused to serve S.D. because she was swerving and leaning on the bar. Weston believed S.D. was unaware how impaired she was and feared she or someone else might get hurt.

And Lewis admitted he knew S.D. was intoxicated. During his interview, Lewis told Holler that after S.D. got in his car, her head was bobbing and she was passing out. At trial, Lewis admitted he thought S.D. was intoxicated when they walked to his car.

Lewis relies on D.L.'s testimony that S.D. was not intoxicated when she was at Rudy's with Lewis and the expert's testimony on cross-examination that her BAC would have been only 0.13 at 1:45 a.m. But we cannot reweigh the evidence. (*Ramirez, supra,* 13 Cal.5th at pp. 1117-1118.) Based on the toxicology evidence and the witnesses' testimonies, it was reasonable for the jury to conclude that Lewis knew or reasonably should have known S.D.'s intoxication level impaired her judgment whether to consent to sexual intercourse. Sufficient evidence supports Lewis's conviction for count 1.

## II.  Count 2—Kidnapping to Commit Rape

Lewis argues the trial court erred by modifying the force or fear requirement to include deception and insufficient evidence supports his conviction. *Lewis, supra,* 14 Cal.5th 876, resolves the former, and the record refutes the latter.

10

In *Lewis, supra,* 14 Cal.5th at page 895, our Supreme Court ruled the "relaxed" standard of force applicable to children applies to incapacitated adults.[4] The court assumed the trial court erred by instructing the jury on deception, but concluded the error was harmless beyond a reasonable doubt. (*Lewis, supra,* 14 Cal.5th at p. 883.) In concluding the error was harmless, the court explained that under the relaxed force standard, "it was undisputed at trial that Lewis used some quantum of physical force to move S.D." (*Id.* at p. 901.) Lewis admitted he drove S.D. away from Rudy's and thus he used the car to apply physical force to S.D. and carry her away. (*Id.* at pp. 901-902.) It concluded, "Thus, even if Lewis used deception to persuade S.D. to accompany him, he still indisputably used physical force as well— i.e., his act of driving S.D.—to accomplish the kidnapping under the relaxed force standard." (*Id.* at p. 902.) The court reversed and remanded to this court for us to resolve Lewis's remaining sufficiency of the evidence contentions concerning the kidnapping to commit rape conviction. (*Id.* at p. 903.)

To prove that crime, the prosecution had to establish, as relevant here, the following: When his movement of S.D. began, Lewis already intended to rape her; S.D. suffered from a mental impairment that made her incapable of giving legal consent to the movement; and Lewis knew or reasonably should have known that S.D. was mentally impaired. We view the evidence in the light most favorable to the prosecution, without reweighing it or reevaluating witness credibility; we presume in support of the judgment the existence of every fact the jury could reasonably infer from the evidence. (*Ramirez, supra,* 13 Cal.5th at pp. 1117-1118.)

There was sufficient evidence for the jury to conclude Lewis intended to rape S.D. at the relevant time. S.D. testified that Lewis gained her trust by claiming his

---

[4] In concurrence, Justice Leondra R. Kruger stated it is best described as a "*constructive*" force standard. (*Lewis, supra,* 14 Cal.5th at p. 907 (conc. opn. of Kruger, J.).)

11

friend had her phone. Lewis promoted that ruse by holding his phone to his head as if calling his friend—his cell phone records established he neither made nor received a call at that time. Minutes later, Lewis was buying S.D. multiple alcoholic drinks.

Despite D.L.'s contrary testimony, there was substantial evidence S.D.'s intoxication level impaired her judgment. When Lewis ordered tequila shots, S.D. was swerving and leaning on the bar. And as discussed above, Lewis believed S.D. was intoxicated. He testified that as they walked from Rudy's to his car he thought S.D. was drunk. And he told the police that S.D. could barely keep her head up and appeared to be passing out when she first got into his car. Indeed, S.D. did black out that night. As a result she was unable to remember what Lewis did after they left Rudy's. Because there was substantial evidence S.D. was mentally incapacitated, the relaxed force standard articulated in *Lewis, supra,* 14 Cal.5th 876, is applicable, and Lewis driving S.D. away from Rudy's satisfied the standard. Based on this evidence, it was reasonable for the jury to conclude Lewis intended to gain S.D.'s trust, plied her with intoxicants to impair her memory, guided her out of Rudy's, and raped her.

This conclusion was bolstered by evidence of Lewis's consciousness of guilt. Lewis lied to Holler about having sex with S.D. The only way his lie would have any possibility of succeeding would be if S.D. had been unconscious or had no memory of events after she and Lewis left Rudy's. In other words, unless Lewis knew S.D. was largely unconscious when they had sex, and thus would be incapable of refuting his story, it is hard to imagine why he would have denied having sex with her. But that is what he did. Viewing all the evidence in the light most favorable to the prosecution, as we are required to do, there was substantial evidence to support the jury's finding Lewis intended to rape the impaired S.D. as the couple left Rudy's and he knew or should have known S.D. was incapable of agreeing to leave Rudy's with him.

We conclude with one final observation regarding the level of incapacitation or unconsciousness required to trigger the Supreme Court's relaxed force

12

or constructive force standard. In our prior opinion, *People v. Lewis, supra,* 72 Cal.App.5th 1, both the majority opinion and the dissent spent considerable time discussing and either distinguishing (the majority) or analogizing to (the dissent) *People v. Daniels* (2009) 176 Cal.App.4th 304, 331 (*Daniels*).

*Daniels, supra,* 176 Cal.App.4th 304, involved an intoxicated and intermittently conscious adult who was completely incapacitated. Defendant was charged with kidnapping to commit rape. (*Id.* at p. 311.) The victim was clearly intoxicated after drinking about 13 shots of alcohol over a few hours. (*Id.* at p. 308.) Over defense counsel's objection, the trial court instructed the jury with a modified version of CALCRIM No. 1201 that included the following language, "the defendant used enough physical force to take and carry away an unresisting person with a mental impairment." (*Daniels, supra,* 176 Cal.App.4th at p. 324.) On appeal, defendant argued the court erred because the line of cases that required a reduced quantum of force for minors, specifically *In re Michele D.* (2002) 29 Cal.4th 600, should not be extended to incapacitated adults. (*Daniels, supra,* 176 Cal.App.4th at p. 331.)

The *Daniels* court disagreed and relied on *Michele D.* to extend its holding to incapacitated adults. (*Daniels, supra,* 176 Cal.App.4th at pp. 331-332.) The court explained the following: "'[O]rdinarily the force element in section 207 requires *something more* than the quantum of physical force necessary to effect movement of the victim from one location to another.' [Citation.] Since an incapacitated person, like an infant, has no ability to resist being taken and carried away, the 'something more' that is 'ordinarily' required is not necessary, and 'the amount of force required to kidnap an [incapacitated person] is simply the amount of physical force required to take and carry the [incapacitated person] away . . . with an illegal intent.' [Citation.]" (*Id.* at p. 332.) The court found sufficient evidence to support giving the wrongful intent instruction: "[The victim] testified that, at the point in time when defendant made contact with her in the alley, she was lying facedown, slipping in and out of consciousness, and unable to

13

move or talk. She had no recollection of how she came to be in defendant's car. A rational jury could have readily concluded that [the victim] was incapacitated and that her state of off-and-on unconsciousness coupled with her inability to move or talk was indicative of a mental impairment that precluded her giving consent at the time that defendant placed her in his car and drove away with her." (*Id*. at p. 333.)

The majority opinion in *People v. Lewis, supra,* 72 Cal.App.5th 1, distinguished *Daniels* because unlike the victim in that case, S.D. was not lying face down on the bar unable to move or talk, and in fact she was able to walk out of Rudy's with Lewis. The dissent reasoned S.D. may have been able to walk and talk in Rudy's, but like the victim in *Daniels*, she lacked the capacity to legally consent to being moved, due to her inebriated condition.

In *Lewis, supra,* 14 Cal.5th at page 895, our Supreme Court discussed *Daniels* and stated the following: "While we agree the victim in *Daniels* likely was more intoxicated than S.D., at least at the moment S.D. left Rudy's, *Daniels* itself did not require such a high degree of intoxication. Instead, the relaxed force standard in *Daniels* depended on the ability of the victim to legally consent. [Citation.] The inability to legally consent does not require total incapacitation or unconsciousness." That leads us to a practical suggestion.

California Rules of Court, rule 2.1050(a), explains: "California jury instructions approved by the Judicial Council are the official instructions for use in the State of California. The goal of these instructions is to improve the quality of jury decision making by providing standardized instructions that accurately state the law in a way that is understandable to the average juror." Subdivision (b) states: "The Judicial Council endorses these instructions for use and makes every effort to ensure that they accurately state existing law. The articulation and interpretation of California law, however, remains within the purview of the Legislature and the courts of review." Subdivision (f) provides: "Use of the Judicial Council instructions is strongly

14

encouraged.  If the latest edition of the jury instructions approved by the Judicial Council contains an instruction applicable to a case and the trial judge determines that the jury should be instructed on the subject, it is recommended that the judge use the Judicial Council instruction unless the judge finds that a different instruction would more accurately state the law and be understood by jurors.  Whenever the latest edition of the Judicial Council jury instructions does not contain an instruction on a subject on which the trial judge determines that the jury should be instructed, or when a Judicial Council instruction cannot be modified to submit the issue properly, the instruction given on that subject should be accurate, brief, understandable, impartial, and free from argument."

Here, in an effort to submit the issue properly to the jury, the trial court modified an existing CALCRIM instruction.  Without addressing the correctness of the modification, the Supreme Court assumed, that even if the modification was error, it was harmless.  To assist the trial courts and avoid instructional error in the future, CALCRIM instructions understandable to the average juror, consistent with the holdings in *Lewis* and relevant existing law, should be adopted.

We invite the Judicial Council to adopt such instructions.  Instructions explaining under what circumstances a jury can apply the relaxed/constructive force standard and explaining what level of incapacitation or unconsciousness is required to trigger the relaxed force or constructive force standard would be extremely beneficial to trial courts and juries.

## DISPOSITION

We affirm the judgment.


                                             O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


GOETHALS, J.