Filed 12/20/21  P. v. Patillo CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHEROD L. PATILLO,<br><br>    Defendant and Appellant. | D078007<br><br><br>(Super. Ct. No. SCD282354) |

APPEAL from a judgment of the Superior Court of San Diego County, Francis M. Devaney, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Rubin Urbanski and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Sherod L. Patillo of rape of an intoxicated person (Pen. Code, § 261, subd. (a)(3)).[1] The trial court instructed the jury on the elements of the crime with an unmodified CALCRIM No. 1002 standard instruction, which provided, in relevant part: "A person is *prevented from resisting* if he or she is so intoxicated that he or she cannot give legal consent. In order to give legal consent, a person must be able to . . . understand and weigh the physical nature of the act, its <u>moral character</u>, and probable consequences." (Underscore added.) Patillo's sole contention on appeal is that it was prejudicial error for the trial court to include the phrase "moral character" because, as he asserts, the language has no support in case law or statutory law and rendered the instruction unconstitutionally vague. Not so. The standard instruction is derived from *People v. Giardino* (2000) 82 Cal.App.4th 454, 466 (*Giardino*), and it has been upheld as correctly stating the law on rape of an intoxicated person. (See *People v. Lujano* (2017) 15 Cal.App.5th 187, 193 (*Lujano*); *People v. Smith* (2010) 191 Cal.App.4th 199, 205 (*Smith*).) We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *The Prosecution Case*

In June 2019, Jane Doe, a 23-year-old college student from northern California, her friend Breanna E., and Breanna's boyfriend, Nick W., took a trip to San Diego. They stayed at a rental home in Mira Mesa. Jane had never been to San Diego before.

---

[1] Unspecified statutory references are to the Penal Code.

On June 28, after swimming at the beach, Jane, Breanna, and Nick made their way to a restaurant in Pacific Beach. Jane wore pants and a tank top over her pink bikini, and flipflops. She carried a purse that contained her wallet and cell phone.

They arrived at the restaurant at around 4:30 or 5:00 p.m. and stayed for about an hour and a half. During this time, Jane drank a "flight" of champagne, which she said consisted of three or four glasses of around five ounces of alcohol each. She and Breanna also shared a drink called a "frosé," which Jane described as a wine "slushy." The three also shared a plate of nachos.

After leaving this restaurant, Jane, Breanna, and Nick went to another restaurant nearby, called El Prez. From 7:00 p.m. until 11:00 p.m., they sat at a rooftop bar consuming food and drinks. They shared a 64-ounce margarita. Jane then ordered a single margarita for herself. She also had another frosé, a shot of tequila, and other drinks she could not recall.

Jane was a "[v]ery light," "[v]ery occasional" drinker. When she did drink, she typically would have one or two glasses of wine, and usually did not have mixed drinks or take shots of alcohol. Jane estimated that by 11:00 p.m., her intoxication level was at a level 7 or 8 on a scale of 1 to 10, with "1 being almost sober, 10 being very intoxicated." Her memory started to become "spotty or fuzzy," and she "became a little bit more clumsy in [her] walking" and "need[ed] to hang on to . . . the rail going downstairs." She described "feeling kind of like almost a balloon in the head, . . . like wobbling a little bit." She was still wearing her pants and tank top and still had her cell phone and purse.

At 11:00 p.m., the rooftop bar closed, and the three headed downstairs to a lower level of El Prez. There, Jane had two more shots of alcohol. She

recalled dancing and hanging out with Breanna and Nick. At that point, however, her memory became foggy; the next thing she recalled was being downstairs outside of El Prez.

According to text messages, it was 12:30 a.m. when Jane, Breanna, and Nick left El Prez. Jane described her intoxication level at this point as a 9 "[g]oing towards a 10" on a scale of 1 to 10. She "was coming in and out of consciousness" and her ability to "keep track of where [she] was, where [she] was going" and her "recollection of everything that was going on was really gray and spotty."

Jane recalled being outside of El Prez with Breanna and Nick and talking to a woman who was with two men with Irish accents. When someone in this group mentioned going to the beach, Jane left Breanna and Nick and went with the woman and the "two Irish guys" to the beach. She did not see Breanna or Nick again that night.

When Jane left to go to the beach, she was still wearing her pants and tank top. She did not recall whether she still had her cell phone or purse. She lost both items at some point, although she could not recall when because she was "coming in and out of consciousness due to the alcohol." When she got to the beach, one of the Irish men stood next to her. They started kissing and fell on the sand because Jane's level of intoxication made her clumsy. She was "having a hard time trying to stand and was getting really woozy." The Irish man started to move his hands underneath Jane's bikini bottoms, and he told her he wanted to have intercourse. Jane told him she did not want to have intercourse, and he got up and left.

Jane then walked by herself towards the sidewalk that ran alongside the beach, where she encountered "guys with two puppies." She "started

4

petting the puppies" and talked to the men about them. One of these men was Patillo.

Jane estimated that after spending five minutes "seeing the dogs and petting them," she walked away. She was still "very in and out of focus and just consciousness of where [she] was and what was going on." From this point, she "start[ed] to blackout some memories." She remembered walking and talking with a Black male who had bleached blond hair and piercings below his bottom lip. At this point, she was no longer wearing her pants and tank top. She testified at trial that she was not sure when she lost her pants and tank top, but she assumed it was when she was on the beach with the Irish man.

At around 1:30 a.m., a bartender at the Baja Beach Café observed Jane in her pink bikini vomiting in a nearby parking lot.

Jane's next memory was of being in front of El Prez on the sidewalk and "being overcome with emotion and realizing that [she] was no longer with [her] . . . friends" and a "sense of fear overtook" her when she realized she was by herself in an unfamiliar place. Until this point, it had not occurred to her that she was separated from her friends. She also realized that her purse and phone were missing. She "had no way of contacting anyone" because she did not have Nick or Breanna's cell phone numbers memorized. She had no family or friends in San Diego and felt "absolutely alone with no way to get home because [she] didn't even have the address of the [rental home]."

Jane encountered a woman named Kayla S. and "begg[ed] her just to take [Jane] home with her" and "to get [Jane] off of the street." Jane was emotional and crying. Her intoxication level was "still at about a 9." Kayla was "very hesitant and insistent that she couldn't . . . help [Jane]." Kayla

5

lent Jane her cell phone to send Breanna a Facebook message since she was unable to recall Breanna's phone number. As Jane was "standing there crying," Patillo appeared on her right side and offered to give her a "ride home and help [her] get home." At the "possibility of being able to get home" and "get somewhere safe," Jane told Patillo, "that would be wonderful" and she "would really appreciate getting a ride home." She then saw Patillo and Kayla walk to the corner of El Prez to talk. When they returned to Jane, Patillo told Jane, "Okay, let's go. I'll help you get home."

Kayla testified that Jane was "disheveled." She was "barefoot and in a bikini[,] and it was kind of cold outside." She was crying and had "streak marks on her face" from either mascara or makeup. Jane was "upset because she had lost her friends, and she didn't know how to get home." She did not have a wallet or a phone. Kayla saw that Jane was "uncomfortable" and "seemed like she may have been drunk." She let Jane use her phone to send Breanna a message on Facebook.

Kayla testified that Patillo then appeared "maybe three or four minutes" after Kayla began talking to Jane. He introduced himself to Kayla as "Rod" and helped Kayla "try to find" where Jane was staying to get her home. After talking with Jane and Patillo for around 25 minutes, Kayla was able to figure out that Jane was staying somewhere in the vicinity of a Vons in Mira Mesa, although they still did not know the rental home's precise location. Jane asked Kayla if she could "come to [Kayla's] house" and if Kayla could get her an Uber ride. Kayla did not have a car and could not drive her anywhere. Patillo then offered to drive Jane home.

Kayla was "a little bit uncomfortable" with Patillo's offer because she did not know Patillo and did not "really feel comfortable with . . . intoxicated females on the street [going away] with random people." But she did not

6

know what else she could do and Patillo "seemed like he was concerned with her safety" too. Kayla "made [Patillo] call [her] immediately" so she would have his phone number, and she asked him to text her "when he got [Jane] home." Kayla also wrote her phone number on Jane's arm and told Jane to call her if she needed anything. During the time she was with Jane and Patillo, Kayla never observed Jane hugging Patillo, kiss or "hang[ ] on" to him; there was no "romantic affection or chemistry" between the two.

Jane and Patillo then walked to Patillo's maroon camper van, which was parked about a mile away. Jane did not remember actually entering the van, but she recalled being inside of it. There were two other men in the van in addition to Patillo. One of them was the man with the blond hair and piercings she had walked with earlier that night.

The van had three rows of seats. Jane sat in a second row seat on the driver's side. Patillo made no attempt to drive her home. When Jane said she was thirsty, someone handed her a drink that she thought was water. When she took a sip, it "tasted really -- really bitter and was not water at all." The drink "burned" in her mouth and "going down [her] throat." After sipping this liquid, she felt "really heavy" and began to fall asleep in her seat.

Jane's next memory was "suddenly" realizing that Patillo was "in front of [her], . . . unzipping his pants." He "mov[ed] [her] bathing suit bottoms down" and "started to have intercourse with [her]." She was still in the second-row passenger seat, but it had been reclined. The man with the piercings was asleep in the seat next to her. At this point, her intoxication level was "still a 9."

Jane testified: "I just was really heavy and wasn't able to think critically or function normally. [¶] . . . [¶] I . . . wasn't able to connect . . . my thoughts with my body and trying to move or physically do something. I was

7

thinking about what I should do, but I couldn't get my body to respond. [¶] . . . [¶]  I was wanting to move him off of me and tried to tell him to stop." But she was not able to say anything or move her body.  Jane explained that the alcohol "weighed [her] down" and "created a disconnect between [her] brain and [her] body."  She testified: "So my mind and body were separated to the point where I couldn't think clearly.  I couldn't talk clearly.  I couldn't move.  Couldn't move in a -- a normal way."  She denied touching Patillo or participating in the sex in any way.

The next thing Jane recalled was that she had fallen asleep only to be "woken up to [her] body shaking."  When she turned her head, she "woke up to a man having intercourse with [her]."  This second time she felt "even heavier than before and even more out of it."  As she explained, "I was in a -- like a much . . . deeper sleep and . . . was jerked awake by the man having intercourse with [her]."  She was still sitting in the same chair, but her legs had been spread apart.  She testified that it "was really dark" and she could not tell which man was having intercourse with her.  She felt pain in between her legs and the sensation of "skin rubbing against skin."  The man with the piercings was in the chair next to her, laughing, and there was another man behind her with his penis in her face.  She slowly moved her arm "with very little strength" towards the man having intercourse with her and weakly said, "no more."  In response, "there was laughter."

Jane recalled a third incident of intercourse, this time with Patillo. Although she "wasn't consciously present for the entire [incident]," she remembered that Patillo was in front of her and her right leg "was being lifted up and moved around while he was having intercourse with [her]."  The sex was "very painful" and there was "a specific spot" inside her that she

8

could remember feeling "being hit over and over again." She was still unable to move.

At 3:47 a.m., Patillo sent Kayla a text message that said, "Hey, I dropped her off. I told her to call you if she needs anything." Kayla, who had stayed awake waiting to hear from Patillo, responded, "Thank you for letting me know. I appreciate it. You left her at the Vons?" Patillo answered, "Yeah. She said she was fine from there." Patillo had not, in fact, taken Jane home.

Jane's next memory was of waking up in the van at around 6:30 a.m. Patillo was asleep in the third row, and the man with the piercings was asleep next to her. There were two puppies at her feet. She was confused and did not immediately remember what had happened. She saw Patillo's cell phone charging in the vehicle's front console. She asked Patillo if she could use it, and he said no. He did not offer to drive her home nor did he try to help her contact her friends.

Jane left the van and walked to a bathroom. She "had a really horrible burning sensation using the bathroom." She testified: "[P]hysically, it felt just like a massive hole between my legs. Just . . . a big hole that when I walked it . . . was this -- just this horrible feeling in between my legs. [¶] And . . . mentally, it just felt like something had just been ripped from me." She sat on the beach and cried for about 45 minutes. She then walked to a building nearby where she found some women who helped her locate her rental home and purchased a Lyft ride for her.

When Jane arrived at the rental home, it was between 8:00 and 9:00 a.m. Breanna met her outside. As they hugged, Jane started crying and "told [Breanna] that [she] was raped." Jane appeared to be in shock.

9

Breanna called the police. Nick went to look for the van and found it where Jane said she had last seen it.

Police officers responded to Patillo's van, which was still parked in the same location. They found three Black males: Patillo and Wesley S., who were inside the van, and Jevontae L., who had just emerged from a sedan parked next to the van. An officer drove Jane to the van for a field identification. Jane identified Patillo as the man who "was having intercourse with [her]." He was placed under arrest. Detective Anthony Munoz searched the van but did not find alcoholic beverages or drugs.

At around 1:00 p.m. that day, a forensic registered nurse performed a sexual assault examination of Jane. The nurse found areas of bruising, redness, and abrasion around most of the circumference of Jane's hymen. The nurse testified these findings were "significant when we're talking about sexual assault" because "we don't often see a lot of sexual-abuse injuries." She further testified she would "[n]ot necessarily" expect to see injuries like those found on Jane's vagina following consensual sex, because female genitalia experiences "increased lubrication" in response to stimulation, which diminishes "the blunt-force trauma that may occur because of nonlubrication." She opined that the injuries had been sustained within 24 hours of the exam. She agreed she could not be certain of their cause and that an explanation "could also be rough sex."

A criminalist from the Forensic Biology Unit of the San Diego Police Department developed DNA profiles for Jane and Patillo and compared them with DNA extracted from biological material swabbed from Jane's body. Patillo was determined to be a 79 percent contributor, and Jane a 21 percent contributor, of DNA extracted from the sperm cell fraction of the vaginal swab specimen. A swab of Jane's right breast contained the DNA of two

individuals, with Patillo contributing 88 percent of this DNA. Jane and the other two men encountered by the police, Wesley and Jevontae, were excluded as contributors. The identity of the 12 percent contributor was not established.

A toxicologist performed a comprehensive drug panel on Jane's urine sample that tested for over 200 drugs, including drugs "often used in a date-rape scenario." The only "date-rape" drug for which Jane's urine was not tested was "GHB," "a depressant drug that typically comes in liquid form" and that "has been used to put in people's drinks to make them tired or sleepy." Jane's urine was not tested for GHB because the test involved a different method of extraction and had to be specifically requested. The toxicologist also did not test for alcohol in Jane's system. Methamphetamines were detected in Jane's urine at a level of 14 nanograms per milliliter. The toxicologist explained this "is a very trace amount," so low it would have had no effect on Jane. He explained that a positive methamphetamine test can result from methamphetamine use, or alternatively that methamphetamine vapor can become deposited on surfaces and absorbed through the skin, or exposure to methamphetamines can occur through use of an over-the-counter inhaler.

Detective Munoz obtained video surveillance footage from a hotel near El Prez, which was located on Reed Avenue. In one of the videos, at time stamp 1:03 a.m., Jane could be seen leaving the beach near the boardwalk at the foot of Reed Avenue. She was dressed only in her bikini. Her gait was unsteady, and as she walked down the stairs to the boardwalk, she staggered before regaining her balance. She then stood in an area near a group of men with two puppies. As she crouched down to pet them, she fell backwards. She sat on the sidewalk playing with the puppies for around five minutes.

11

She then stood up, appeared to talk to the men, and gave two or three of them hugs. At one point, she leaned over the wall separating the boardwalk from the beach. After spending around 25 minutes in this area, Jane walked away with the men on the boardwalk.

Another surveillance video showed Jane and four men walking on the boardwalk. The four men were identified as Patillo, Wesley, Jevontae, and another friend of Patillo's, David H. Jane could be seen walking next to Patillo. A third video showed Jane walking in the alley southward toward Reed Avenue with David. Jane was "zigzagging" and "exhibiting an unsteady gait" and bumped into David as she walked. When they reached the end of the alley, Jane turned east on Reed Avenue and walked toward El Prez.

## II.

### *The Defense Case*

Patillo testified in his defense. He left the Navy in 2016 after serving for four years. Also in 2016, he was convicted of felony assault by means likely to produce great bodily injury.

Patillo owned the maroon camper van and his older brother, Jevontae, lived in it. Although Patillo lived in a rented room in Ramona, he occasionally spent the night in the van.

In the early morning of June 29, 2019, Patillo was hanging out on the boardwalk with Jevontae and his friends Wesley and David. Patillo had his dogs with him. He saw Jane coming from the beach and noticed "[s]he didn't have on any clothes besides her bikini." Jane asked Patillo if she could pet his dogs, and he said yes. Jane was acting "[f]riendly" and he "could tell that she probably had a couple drinks."

Patillo testified that Jane gave hugs to him, Wesley, and David. She flirted with Patillo "[j]ust through conversation," and was making "certain

12

passes," which he described as Jane "trying to meet someone that . . . she could . . . have a relationship with." Patillo testified that Jane fell on her backside after one of his dogs tried to lick her face.

When Patillo left with Jevontae, Wesley, and David to go move his van, Jane joined them. She said she had been separated from her friends and "didn't really have anywhere to go" and "felt comfortable and safe with [them] and asked if she could tag along." After this group arrived at Patillo's van and got inside, Jane left the van, and David went with her "to make sure she was okay."

After Patillo moved his van, he smoked "[w]eed" with Jevontae and Wesley. David showed up without Jane. Patillo "felt concerned" so he went to go look for her. He found Jane with Kayla in front of a bar nearby. He spent 25 to 30 minutes with them "trying to help [Jane] in making it home." Once they had "a guesstimate of where the [rental home] might be," he asked Kayla if she could help Jane get home, and Kayla insisted she could not. Patillo then "offered assistance." Kayla got Patillo's information and told him to "let [her] know . . . when she makes it back."

Patillo testified that Jane was "walking fine" and was not crying when she accompanied Patillo to his van. Patillo and Jane arrived at the van and got inside. He "roll[ed] [and smoked] another blunt." Jane started rubbing his legs. Jane acted like "she wasn't . . . worried about the fact that [her friends] left." They started to kiss. Patillo "grabbed" and "proceeded [to] suck[ ] on her breasts and stuff like that." Jane gave him oral sex. Patillo claimed she removed her own clothing, including her bikini bottoms, and they "proceeded to have intercourse" while Wesley slept in the seat next to them.

Patillo stopped in the middle of the act of intercourse without ejaculating because he needed to "take a break" for two or three minutes.

13

"After the break [they] proceeded to have sex again and . . . after this time [he] ended up ejaculating." Patillo denied the sex was forceful or rough. Jane "was rubbing [his] back" and "grabbing on [him], pulling [him] in."

After they were done having sexual intercourse, Patillo woke Wesley up, and they "smoked." As he "got ready to lay down," Wesley "started having interactions" with Jane and was trying to receive oral sex. Jane did not want to give him oral sex, and said "it's her decision, they're not dating, she can choose whether or not she wanted to give him oral sex or not." However, as Patillo laid down to go to sleep, "from their interactions, [he] perceived that they were getting ready to have sex" and believed that they did.

In the morning, Jane asked Patillo if she could use his phone to contact her friends. Patillo told her his phone was not charged, but he could charge it and let her use it after it was charged. Jane became angry. Jane then asked for a blanket, he gave her one, and she got out of the van. Patillo went to sleep and was awakened by the police knocking on the van window.

When he was questioned by Detective Munoz, Patillo said he could tell Jane had been drinking but that "she didn't seem like she was fully drunk." She did not need assistance to walk and was able to hold a conversation. Patillo believed that Jane consented to sexual intercourse because she was "engaging" with him by pulling him in, and because she performed oral sex on him. There was never a time when it seemed like she did not enjoy it or wanted him to stop.

Patillo admitted he was not truthful when he sent Kayla the text message about dropping Jane off at the Vons. He testified he sent the message because his "phone was on the verge of dying," he knew he "wasn't going to be dropping [Jane] off until the morning," and he "just wanted

14

[Kayla] to know that [Jane] was going to be okay because [he] knew that she would."

Patillo also admitted he was not truthful when speaking to Detective Munoz. He had told Munoz that his van was parked in the same place all night, when it was not, and falsely stated to Munoz that he had witnessed Jane and Wesley having sex.

On cross-examination, Patillo acknowledged he could "tell that [Jane] wasn't completely sober." He testified that he had "been around people that drink" and that "it's not hard to know if someone's had a couple drinks or not." He stated, "someone that's completely sober wouldn't just be walking around with [a] bikini on at 2:00 something, 1:00 something in the morning," and agreed this "was an indication . . . something was off." He also noticed that Jane "repeated herself" and that "every now and then she might sway." He admitted that he first told Detective Munoz that when he met Jane, "[s]he was fine," "was having perfect conversation," and "[e]verything was 100 percent fine." He told the detective Jane "didn't seem like she had been drinking like that." Once confronted with contrary evidence, Patillo "changed [his] story" and admitted he "could tell she had been drinking."

Patillo also testified on cross-examination that he initially intended to drop Jane off at the Vons, but then thought about it and realized "it's 3:00 something in the morning" and "[a]ll she has is a bikini" and decided "it really doesn't seem like a great idea." His "main[ ]" reason for deciding not to drop Jane off at the Vons was that he was "high" and "didn't want to get a DUI." The realization that it was not a good idea to drive Jane home occurred to him when they got back to the van. He testified that he did try to help Jane contact a friend, but that Jane had been unable to remember her friend's Facebook information.

15

### III.

### *Jury Instructions and Verdict*

Patillo was charged with three counts of rape of an intoxicated person (§ 261, subd. (a)(3)).[2]  At trial, the jury was instructed on the elements of rape by intoxication pursuant to an unmodified CALCRIM No. 1002 standard instruction.[3]

---

[2]  Section 261, subdivision (a)(3), provides: "Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances:  [¶] . . . [¶]  (3) Where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused."  During closing arguments, the prosecutor told the jury that each of the three counts of rape by intoxication related to "a moment in time when the victim remembers the defendant having sex with her," and that the first count "is the first moment in time, second is the next time she wakes up, third is the third time she wakes up."

[3]  The version of CALCRIM No. 1002 given in this case stated, in full, as follows: "The defendant is charged in Counts One, Two, and Three with raping a woman while she was intoxicated in violation of Penal Code section 261, subdivision (a)(3).  [¶]  To prove that the defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant had sexual intercourse with a woman; [¶]  2.  He and the woman were not married to each other at the time of the intercourse; [¶]  3.  The effect of an intoxicating substance prevented the woman from resisting; [¶]  AND [¶]  4.  The defendant knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting.  [¶]  *Sexual intercourse* means any penetration, no matter how slight, of the vagina or genitalia by the penis.  [¶]  A person is *prevented from resisting* if he or she is so intoxicated that he or she cannot give legal consent.  In order to give legal consent, a person must be able to exercise reasonable judgment.  In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences.  Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved.  [¶]  The defendant is not guilty of this crime if he actually and reasonably believed that the woman was capable of consenting to sexual

16

The prosecutor urged the jury to find that Jane's level of intoxication had prevented her from resisting sexual intercourse. He argued that Jane's behavior showed she was not "exercising reasonable judgment" and was "someone who can't give legal consent." He argued the surveillance video footage showed Jane could not "walk a straight line," suggesting she could not pass the "heel to toe" walk test of a DUI investigation. He argued that when Jane was seen in the video footage leaning over the beach wall near the three men, she was vomiting. He pointed out that Jane was walking around Pacific Beach "at about 1:30 in the morning" wearing only a bikini, seemingly unaware of "how inappropriately dressed she [was] for the situation."

The prosecutor urged the jury to reject Patillo's version of events, including because he had admitted lying to the detective and was therefore not a credible witness. The prosecutor argued the surveillance video footage of Jane "falling" and "not walking straight lines" was inconsistent with Patillo's claim that Jane seemed like someone who "just had a couple drinks" and appeared "fine." He asserted that the injuries to Jane's genitalia conflicted with Patillo's claim they had engaged in "consensual, sober sex." The prosecutor concluded that "the defendant knew -- and even if he doesn't want [to] admit it, he reasonabl[y] should have known -- that Jane Doe was prevented from resisting due to the effects of the intoxicating substance."

Defense counsel argued that Jane had woken up on the morning of June 29, 2019, embarrassed by her behavior, and was trying to "cure[ ]" her "[m]orning-after regret" with "a rape allegation." She asserted the People

intercourse, even if that belief was wrong. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman was capable of consenting. If the People have not met this burden, you must find the defendant not guilty."

17

had failed to meet their burden of proving beyond a reasonable doubt that Patillo knew or reasonably should have known Jane was incapable of consenting to sex. She noted that Jane had been able to say no and "limit the sexual contact" with the Irish man. She argued Jane was "able to engage in conversation" and "walk unassisted" and was not "so passed out that she needed to be helped [or] rendered aid[.]" She asserted that Jane had "participated in the sexual acts." She pointed out that this was Patillo's first time meeting Jane, that Jane had seemed "lively and friendly," and asked the jury to consider, "how was he to know if she's too intoxicated to consent?"

During deliberations, the jury sent a note that stated: "In reference to #4 in Cal. Crim. 1002, we want to know if Mr. Patillo's idea or beliefs of 'consent' or 'resisting' need to match the legal definition.'" (Capitalization omitted.) In discussion with both attorneys, the court proposed the following answer: " 'In response to your question, the Court refers you to the language of CALCRIM 1002,' period, no further explanation other than telling them read it closely." Both attorneys stated they had no comments and the court responded to the jury's question as proposed. The next morning, after deliberating less than a day, the jury returned a verdict finding Patillo guilty on count 1, and not guilty on counts 2 and 3.

On September 1, 2020, the court sentenced Patillo to the middle term of six years in state prison. This timely appeal followed.

## DISCUSSION

## I.

*Patillo Did Not Forfeit the Question of Whether the Alleged Instructional Error Affected His Substantial Rights*

The trial court instructed the jury on the elements of rape of an intoxicated person pursuant to the CALCRIM No. 1002 standard instruction.

18

Relevant here, the instruction provided: "A person is *prevented from resisting* if he or she is so intoxicated that he or she cannot give legal consent. In order to give legal consent, a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its <u>moral character</u>, and probable consequences. Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved." (Underscore added.)[4]

Patillo's sole contention on appeal is that the trial court committed prejudicial error by failing to sua sponte modify the standard instruction by removing the phrase " 'moral character.' " Before we turn to the merits and specifics of Patillo's claim of instructional error, we address the parties' dispute whether his claim has been forfeited.

The court discussed jury instructions with counsel two times during the trial. Neither conference was reported. Following one of the discussions, defense counsel stated on the record, "I've gone over the jury instructions as directed by the [c]ourt. I'm comfortable as they are."

---

[4] As previously noted, section 261, subdivision (a)(3), proscribes sexual intercourse with a person who is "*prevented from resisting* by any intoxicating or anesthetic substance, or any controlled substance, [where] this condition was known, or reasonably should have been known by the accused." (Italics added.) The CALCRIM No. 1002 standard instruction incorporates this phrase in its articulation of the third and fourth elements of rape by intoxication. (See *id.* [listing the elements of rape by intoxication as "1. The defendant had sexual intercourse with a woman;" "2. He and the woman were (not married/married) to each other at the time of the intercourse;" "3. The effect of (a/an) (intoxicating/anesthetic/controlled) substance prevented the woman from resisting;" and "4. The defendant knew or reasonably should have known that the effect of (a/an) (intoxicating/anesthetic/controlled) substance prevented the woman from resisting"].)

19

Patillo concedes his trial counsel did not object to the phrase " 'moral character' " or ask the court to remove the phrase from the instruction. He asserts that an objection was not necessary, however, because the error affected his substantial rights. The People argue that defense counsel's failure to object or seek modification of the instruction forfeits the issue on appeal, but they appear to acknowledge Patillo's claim of instructional error can be reviewed to determine whether his substantial rights were affected.

Under section 1259, "[t]he appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." Patillo's claim of instructional error pertains to the instruction's definition of "prevented from resisting," which relates to the elements of the crime. (See fn. 4, *ante*.) Thus, Patillo's counsel was not required to object to the instruction in the trial court to preserve his challenge for appeal. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 ["Instructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review."].)

And although defense counsel stated she was "comfortable" with the jury instructions, which presumably included the instructional language Patillo now challenges, the People do not contend defense counsel thereby invited the asserted error. "The court's duty to apply the correct law in criminal cases can only be negated in those 'special situations' in which defense counsel *deliberately or expressly*, as a matter of trial tactics, caused the error." (*People v. Tapia* (1994) 25 Cal.App.4th 984, 1030.) "Error is invited only if defense counsel affirmatively causes the error and makes 'clear that [she] acted for tactical reasons and not out of ignorance or mistake' or forgetfulness." (*Id.* at p. 1031, quoting *People v. Wickersham* (1982) 32 Cal.3d

20

307, 330, disapproved on other grounds by *People v. Barton* (1995) 12 Cal.4th 186, 201.) The People do not assert that defense counsel refrained from objecting for tactical reasons, nor does the record suggest such a strategy was employed.

Therefore, we will proceed in accordance with section 1259 and determine whether the instructional error identified by Patillo affected his substantial rights. "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) We review claims of instructional error de novo by considering the wording of the instruction and assessing whether it accurately states the law. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

## II.

### *The Instruction's Reference to the "Moral Character" Explains Capacity to Give Legal Consent and Is Supported by Legal Authority*

Patillo contends there is an absence of legal support for including the phrase "moral character" in CALCRIM No. 1002. He leads off by asserting that "[t]he Bench Notes to CALCRIM No. 1002 do not expressly identify the legal authority for the inclusion of the phrase 'moral character,' in the instruction." This assertion is incorrect. CALCRIM No. 1002 lists the authorities supporting various parts of its text, including its definition of " 'Prevented From Resisting,' " which is the part of the instruction where the phrase "moral character" appears. The authorities cited as supporting this part of the instruction are *Giardino, supra*, 82 Cal.App.4th at pages 465–466,

21

and *Lujano*, *supra*, 15 Cal.App.5th at pages 192–193.  The phrase Patillo challenges as legally erroneous is taken directly from *Giardino*.

The defendant in *Giardino* was convicted by a jury of rape of an intoxicated person in violation of section 261, subdivision (a)(3).  (*Giardino*, *supra*, 82 Cal.App.4th at p. 458.)  On appeal, he argued that the trial court erred when it declined to instruct the jury that lack of consent, as defined in section 261.6,[5] is an element of rape by intoxication.  (*Id.* at p. 459.)

The *Giardino* court disagreed.  It explained that section 261.6 defines " 'actual consent,' " that is, "consent that is actually and freely given," which is a concept distinct from "capacity to give legally cognizable consent." (*Giardino*, *supra*, 82 Cal.App.4th at p. 460.)  "For example, if the victim is so unsound of mind that he or she is incapable of giving legal consent, the fact that he or she may have given actual consent does not prevent a conviction of rape." (*Ibid.*, citing *People v. Griffin* (1897) 117 Cal. 583, 585–587 (*Griffin*), overruled on other grounds by *People v. Hernandez* (1964) 61 Cal. 2d 529, 536.)

The court further observed that "the various means of committing rape specified in the subdivisions of section 261 deal with the lack of the victim's actual consent while others deal with the victim's lack of capacity, i.e., with the lack of legal consent." (*Giardino*, *supra*, 82 Cal.App.4th at p. 460.)  It explained that the forms of intercourse in section 261 that are "accomplished against the victim's will . . . describe instances in which the victim has not

---

5       Section 261.6 states, in relevant part, as follows:  "In prosecutions under Section 261, 262, 286, 287, or 289, or former Section 288a, in which consent is at issue, 'consent' shall be defined to mean positive cooperation in act or attitude pursuant to an exercise of free will.  The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved."

actually consented." (*Giardino*, at p. 460 [listing as instances of this type of rape the conduct described in "subdivisions (a)(2) (force or duress), (a)(6) (threat of retaliation), and (a)(7) (threat of detention or deportation) of section 261"].) "By contrast, subdivision (a)(1) of section 261 proscribes sexual intercourse with a person who lacks the capacity to give legal consent due to a mental disorder or a developmental or physical disability." (*Id.* at pp. 460–461.) The court stated that this "distinction" between lack of actual consent and lack of capacity to give legal consent "determines the instructions that are relevant to the charge." (*Id.* at p. 461.) "A charge that the defendant accomplished the act of sexual intercourse against the will of the victim, together with evidence that places in dispute the willingness of the victim to engage in intercourse, entitles the defendant to an instruction that the act was not criminal if it was committed with the victim's actual consent. [Citations.] But if the charge is that the victim lacked the capacity to give legal consent (such as § 261, subd. (a)(1)), then actual consent is irrelevant, and the jury instructions need not touch on that issue." (*Ibid.*)

The court then analyzed California case law to determine how to categorize rape of an intoxicated person, and specifically to determine whether the words " 'prevented from resisting' " in subdivision (a)(3) of section 261 "pertain to the victim's actual consent or to the victim's ability to give legal consent." (*Giardino*, *supra*, 82 Cal.App.4th at pp. 461–464.) We need not recite the court's complete exegesis here. It suffices to say that after reviewing "California Supreme Court case law concerning rape of a mentally incompetent person, as well as Court of Appeal cases dealing with substantial evidence challenges to convictions for rape of an intoxicated person" (*Lujano*, *supra*, 15 Cal.App.5th at p. 193 [discussing *Giardino*]), the court concluded that "section 261(a)(3) proscribes sexual intercourse with a person who is not

23

capable of giving legal consent because of intoxication, [that] the lack of actual consent is not an element of the crime" (*Giardino*, at p. 464), and that the trial court was therefore not required to instruct the jury on actual consent (*ibid.*).

The *Giardino* court went on to consider defendant's second claim on appeal, which was that the trial court erred when it instructed the jury with the elements of section 261, subdivision (a)(3), but failed to define the phrase " 'prevented from resisting' " in response to a jury request for a definition. (*Giardino*, *supra*, 82 Cal.App.4th at p. 464.) The court observed that the trial court has a duty to help the jury understand the relevant legal principles (*id.* at p. 465) and that "[t]he meaning of 'prevented from resisting' in this context is not clear" (*id.* at p. 466). The court stated that "the jury should have been instructed that its task was to determine whether, as a result of her level of intoxication, the victim lacked the legal capacity to give 'consent' as that term is defined in section 261.6. Legal capacity is the ability to exercise reasonable judgment, i.e., to understand and weigh not only the physical nature of the act, but also *its moral character* and probable consequences." (*Ibid.*, italics added, citing *Griffin*, *supra*, 117 Cal. at p. 585, *People v. Boggs* (1930) 107 Cal.App. 492, 495 (*Boggs*), and *People v. Peery* (1914) 26 Cal.App. 143, 145 (*Peery*).)

As is obvious from this quote of the *Giardino* opinion, *Giardino* is the source of the phrase "moral character" that Patillo claims was erroneously included in CALCRIM No. 1002. Not only is this phrase part of the standard instruction as well as the holding of *Giardino*, but Patillo also does not cite, nor has our independent research disclosed, a California case critical of *Giardino*'s articulation of the definition of capacity to give legal consent to sexual intercourse. To the contrary, in *Lujano*, the Court of Appeal "agree[d]

24

with . . . the thorough analysis in *Giardino*" and concluded its holding "applies equally to the identical language in section 286, subdivision (i)," the Penal Code provision pertaining to sodomy by intoxication. (*Lujano*, *supra*, 15 Cal.App.5th at p. 193.) And CALCRIM No. 1002 itself has been upheld as correctly incorporating the law of rape of an intoxicated person as set forth in *Giardino*. (*Smith, supra,* 191 Cal.App.4th at p. 205.)

Apparently recognizing that *Giardino* is the source of the phrase he characterizes as legally erroneous, Patillo turns his critique to *Giardino*. He contends that *Griffin*, *Boggs*, and *Peery*—the cases cited by *Giardino* as analogous authorities supporting its articulation of the definition for capacity to give legal consent to sexual intercourse—"do not support the inclusion of the 'moral character' language" in either the holding of *Giardino* or the CALCRIM No. 1002 instruction. Patillo fails to establish error.

*Griffin*, *Boggs*, and *Peery* all involved sufficiency of the evidence challenges to rape convictions stemming from acts of sexual intercourse with women alleged to be mentally unsound. (See *Griffin*, *supra*, 117 Cal. at pp. 584, 585 [quoting section 261, former subdivision (2)]; *Boggs*, *supra*, 107 Cal.App. at p. 493; *Peery*, *supra*, 26 Cal.App. at p. 144.) Of the three cited cases, *Griffin* is the only high court opinion, and the only decision binding on the *Giardino* court. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455–456.)

In *Griffin*, the California Supreme Court explained: "In this species of rape neither force upon the part of the man, nor resistance upon the part of the woman, forms an element of the crime. If, by reason of any mental weakness, she is incapable of legally consenting, resistance is not expected any more than it is in the case of one who has been drugged to unconsciousness, or robbed of judgment by intoxicants. Nor will an apparent

25

consent in such a case avail any more than in the case of a child who may actually consent, but who, by law, is conclusively held incapable of legal consent. [¶] Whether the woman possessed mental capacity sufficient to give legal consent must, saving in exceptional cases, remain a question of fact for the jury. *It need but be said that legal consent presupposes an intelligence capable of understanding the act, its nature, and possible consequences*." (*Griffin*, *supra*, 117 Cal. at p. 585, italics added.)

We discern no stare decisis violation, to the extent that Patillo asserts any such violation. In *Griffin*, the California Supreme Court referred to the "nature" of sexual intercourse. The Court's statement that "[i]t need but be said that legal consent presupposes an intelligence capable of understanding the act, its nature, and possible consequences" (*Griffin*, *supra*, 117 Cal. at p. 585) is broadly-worded enough to encompass *Giardino*'s finer articulation of the rule, including its reference to the "moral character" of sexual intercourse, a concept that signifies that the decision to have sexual intercourse has a moral dimension.

Patillo baldly asserts that the word " 'nature' " as used in *Griffin* "appears to refer to the physical act." We disagree with this unsupported observation. Our high court listed the "nature" of sex separately from the "act," indicating these words were intended to signify different aspects of sexual intercourse. Sexual intercourse is complex, and the word "nature" is broad enough to include its nonphysical aspects. The observation in *Boggs*— that the *Griffin* court's reference to "intelligence capable of understanding the act, its nature, and possible consequences" (*Griffin, supra*, 117 Cal. at p. 585) "must be an intelligent understanding" of "more than the mere physical consequences" of sexual intercourse—supports this view (*Boggs*, *supra*, 107 Cal.App. at p. 496).

26

Patillo further asserts that *Griffin*'s use of the word " 'nature' " was not intended to refer to "a normative assessment of the moral character of the conduct." Perhaps not, but that is not what *Giardino* intended, either. Rather, *Giardino*'s articulation of the test for legal capacity to consent (and the CALCRIM No. 1002 adoption of it) established that the person must be able "to understand and weigh" among other factors, the moral character of the act. (*Giardino*, *supra*, 82 Cal.App.4th at p. 466.) The capacity of the person to weigh and understand moral consequences is the factor the jury is to consider, not the morality of the decision itself.

Patillo next contends that *Peery* was wrongly decided, because its reference to " 'immoral character' " was an unwarranted extension of *Griffin* as well as a now-outdated reference to "meretricious conduct between unmarried adults." There the Court of Appeal paraphrased *Griffin,* in relevant part, as follows: "Legal consent which will be held sufficient assumes a capacity in the person consenting to understand and appreciate the nature of the act committed, *its immoral character* and the probable or natural consequences which may attend it." (*Peery, supra,* 26 Cal.App. at pp. 145–146, italics added.) As *Peery* was not the provenance of CALCRIM No. 1002's definition of " 'Prevented From Resisting,' " however, a critical evaluation of *Peery* is beyond the necessary scope of our review.

In addition to arguing that there is an absence of support in case law for including the phrase "moral character" in the instruction, Patillo argues that including the phrase in CALCRIM No. 1002 puts the instruction in conflict with statutory law, specifically, section 261.6. We disagree. *Giardino* itself provides the grounds for refuting this contention. As *Giardino* explained, section 261.6 defines actual consent, a concept distinct from capacity to give legal consent. (*Giardino*, *supra*, 82 Cal.App.4th at pp. 460,

27

461.) The phrase Patillo challenges as erroneous is part of the instruction's explanation of this distinct concept of what it means to "be able" to "give legal consent." (CALCRIM No. 1002.) This concept is neither governed by, nor derived from, the definition of actual consent in section 261.6. No conflict is created by the instruction's articulation of the relevant standard governing capacity to give legal consent. This distinction dispenses with Patillo's related assertion that section 261.6 will be rendered unconstitutionally vague if it is construed as embracing the instruction's reference to " 'moral character.' " Again, this part of the CALCRIM No. 1002 instruction does not implicate the statutory test for actual consent set forth in section 261.6.[6]

### III.

*The Phrase "Moral Character" Does Not Render CALCRIM No. 1002*

*Unconstitutionally Vague*

Finally, Patillo contends that the reference to " 'moral character' " in CALCRIM No. 1002 renders the instruction unconstitutionally vague. He maintains that " 'moral character' " is a vague concept subject to "wildly

---

[6] Citing a law review note (Reed, *Criminal Law and the Capacity of Mentally Retarded Persons to Consent to Sexual Activity* (1997) 83 Va. L.Rev. 799, 812–817 (*Criminal Law and Capacity*)), Patillo contends for the first time in his reply brief that "[t]he fact that a minority of states require the victim to understand the moral dimension of engaging in sexual relations to give legal consent" indicates that "an interpretation of section 261.6" that adds a "judicial gloss of 'moral character' " "is bad public policy and bad law." Even if were to consider this belated assertion (*People v. Newton* (2007) 155 Cal.App.4th 1000, 1005 [appellate courts do not consider arguments raised for the first time in reply where the appellant makes no attempt to show good cause for failing to raise the point sooner]), it does not persuade us to reconsider *Giardino*. The law review note indicates the tally is seven states to six, hardly an overwhelming majority. (See *Criminal Law and Capacity*, at pp. 813–814, fns. 110, 111.)

conflicting meanings to people of ordinary intelligence," and that the phrase "required [Jane] to weigh and understand the 'moral character' of having sexual intercourse with [him]." We disagree with this contention as well.

Jury instructions are not scrutinized under the void-for-vagueness doctrine that applies to penal statutes because "an instruction does not establish the elements of a crime, but merely attempts to explain a statutory definition." (*People v. Raley* (1992) 2 Cal.4th 870, 901.) "Rather, when it is argued [that an] instruction is so vague and confusing as to violate fundamental ideas of fairness, 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.'" (*Ibid.*)

Applying this standard here, we conclude there is not a reasonable likelihood the jury understood the instruction in the way Patillo suggests. Patillo cites the concurring opinion in *Islas-Veloz v. Whitaker* (9th Cir. 2019) 914 F.3d 1249, 1256–1260, finding that the phrase " ' "crime involving moral turpitude"'" in the Immigration and Nationality Act is unconstitutionally vague, and *Musser v. Utah* (1948) 333 U.S. 95, 97–98, holding the phrase " 'injurious to public morals'" unconstitutionally vague. Although the word "moral" may be unworkable in other contexts not relevant here, that is not the case here.

The instruction describes, in qualitative terms, the degree of lucidity an intoxicated person must possess in order to give legal consent to sexual intercourse. Viewed in context, the CALCRIM No. 1002 instruction states that to give legal consent, a person "must be able to exercise reasonable judgment. In other words, the person must *be able* to understand and weigh the physical nature of the act, its moral character, and probable consequences." (Italics added.) The instruction did not require jurors to

29

judge the morality of Jane's conduct or determine whether her sexual behavior comported with their own unique values. It also did not require jurors to attempt to divine the contents of Jane's thoughts and confirm she actually did weigh and understand the "moral character" of having sexual intercourse with Patillo. Rather, it told the jury that Jane's ability to exercise reasonable judgment included the *ability* to consider, among other factors, the moral dimension of the act. The instruction merely explained that if Jane's level of intoxication rendered her unable to understand and weigh such matters, then she was too intoxicated to give legal consent to sexual intercourse. The phrase "moral character" did not create an unworkable standard or render the instruction, as a whole, ambiguous.

For these reasons, we also reject Patillo's apparent contention that he was deprived of his constitutional right to a jury determination of all facts pertaining to his guilt or innocence because the jury could not have accurately determined whether Jane *actually* weighed and understood the moral character of her conduct.

In sum, Patillo's claim of instructional error fails. Having determined that his claim lacks merit, we end our analysis here.

## DISPOSITION

The judgment is affirmed.

DO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.