Filed 3/5/26  P. v. Alvaro CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAVIER MENDEZ ALVARO,<br><br>    Defendant and Appellant. | A171657<br><br>(Solano County Super. Ct.<br>No. FCR358762) |

A jury found defendant Javier Mendez Alvaro guilty of 10 counts arising from sexual offenses against two minors.  On appeal, defendant contends the trial court erred in responding to a jury question.  He also argues no substantial evidence supports count 1, a conviction for sodomy, and he raises a claim of sentencing error.

Finding no reversible error, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

By amended information, the Solano County District Attorney alleged defendant committed five offenses involving victim S. and five offenses involving victim C.

As to victim S., defendant was charged with sodomy with a child 10 years of age or younger (Pen. Code,[1] § 288.7, subd. (a); count 1), sexual

_____

[1] Further undesignated statutory references are to the Penal Code.

1

intercourse with a child 10 or younger (*ibid.*; count 2), and two counts of lewd act upon a child under 14 (§ 288, subd. (a); counts 3–4), with all four offenses alleged to have occurred between January 14, 2020, and January 13, 2021, and another count of lewd act upon a child alleged to have occurred on or about June 13, 2021 (count 5).

As to victim C., defendant was charged with four counts of lewd act upon a child under 14 years of age (§ 288, subd. (a)), alleged to have occurred between April 27, 2016, and April 26, 2017 (count 6), in December 2019 (count 7), between June 1 and July 31, 2020 (count 8), and in September 2020 (count 9), and aggravated sexual assault of a child under 14 (§ 269, subd. (a)(1); count 10), alleged to have occurred in January 2021.

*The Prosecution's Case*

Background

C. (born in 2007) and S. (born in 2011) are half-sisters. (They have the same mother and different fathers.) The girls' mother (Mother) started dating defendant, and defendant moved into the family's two-bedroom apartment when C. was about eight years old (around 2014). The apartment had two stories with the bedrooms upstairs. C. and S. shared a bedroom, and defendant shared a bedroom with Mother (Mother's bedroom). Defendant lived with the family for about six years.

C.'s Testimony

At the time of trial, C. was 17 years old. She testified about an incident when she was nine years old. Mother was downstairs in the kitchen with her friends, and defendant "invited [C.] upstairs" with a waving hand gesture. C. and defendant went into Mother's bedroom, and defendant closed and locked the door. Defendant asked C. what she wanted for her birthday. C. told him she wanted an iPod, and he said he would buy it for her. Defendant "sat [C.]

2

on his lap" and "caressed" her. He touched her back and thighs, and C. got scared. She told defendant she was hungry, and he let her go.

The second incident C. recalled occurred when she was in seventh grade in the winter of 2019. Mother was working a night shift, and C. and S. were home alone with defendant. C. and S. were in their bedroom when the door opened, and defendant "signaled [for C.] to come out" with a waving hand gesture.

C. followed defendant to Mother's bedroom. Defendant lay on the bed and pulled his pants down. C. thought he was drunk "because his breath smelled funny, smelled like alcohol." Defendant "made [C.] touch him." C. saw his penis. Defendant "told [C.] to just touch the top," and she "was hesitant, but [she] ended up doing it." Defendant "told [C.] to use [her] mouth," but she did not want to. C. had "panic on [her] face" and "was about to start crying," "but he made [her] do it anyways." Defendant made C. lie down on the bed. He took C.'s pants and underwear off, took his own clothes off, and "got on top of [C]." Then defendant "raped [C]." C. testified, "He put his penis in my vagina," and "[i]t burned a lot and it hurt." Afterward, C. went to the bathroom, and "when [she] wiped [her]self, there was semen all over the tissue," "like condensed milk."

The next day, defendant apologized to C. Defendant said "he was drunk and that he would never do it again. He would stop drinking." C. told a friend about what happened, but she did not tell her family because she "was scared of their reaction." Regarding her disclosure to a friend, C. testified she "texted [Jordan D.] about it" "around Christmastime" "somewhere along seventh grade."

In eighth grade, school shifted online due to COVID, and the sexual abuse by defendant "happened more often." C. testified that "a lot of the

3

events kind of blurred together," but she was able to describe another specific incident, which she thought happened in mid to late January 2021, when Mother was pregnant. Defendant came into the kitchen smelling of alcohol. His eyes were bloodshot, "he was loopy and couldn't even walk," and he giggled as he talked to C. C. testified that defendant "ask[ed] me if I wanted to do it." C. grabbed a kitchen knife, and defendant took the knife from her hand and tossed it on the table. Defendant "turned [C.] around" and "slid [her] pants down." She went to the bathroom to get away, but defendant pushed his way in before she could close the door. He "pushed [her] onto the toilet" and "raped [her]." Defendant ejaculated on her thigh.

This incident was "the last time something like this happened." Incidents like this occurred "[m]aybe like three or four" other times between the first incident and the last. Each time, defendant had been drinking, and he had vaginal sex with C.

C. reported defendant's conduct to the police on June 13, 2021. That day, defendant and C.'s family went to defendant's friend's house near their apartment. They had oysters in the backyard, and "[defendant] and his friend were drinking." At some point, C., her sister S., and Mother walked home to go to bed, but defendant "decided to stay with his friend and keep drinking."

At home, C. and S. were in their bedroom, and Mother was in her bedroom with her new baby. When defendant later came home, he stayed downstairs. He texted C. asking whether she was asleep and telling her to come downstairs. Defendant texted, "hurry up, if not, I'm going to get upset." C. "was terrified" and "scared he was going to do something to [her] mom or [her] brother." C. tried to call various relatives and eventually spoke with Maribel, S.'s older half-sister. C. sent Maribel screenshots of the messages

4

from defendant, and Maribel and her husband drove to C.'s apartment. C. was in tears, and S. asked her what was wrong. C. told S. that defendant "did bad things to" her and he "raped" her. S. started to cry. C. and S. left the apartment and got in Maribel's car. They went to the police station, and C. spoke with the police.

At trial, C. reviewed the transcript of her police interview to refresh her recollection about when the offenses occurred. She recalled defendant had sex with her in June or July of 2020 around the time they learned Mother was pregnant. C. recalled that in September 2020, the family went to Granite Bay, and defendant kept trying to get closer to her in the water. Nothing happened that day, but something happened later when they were at home.

Defendant's Text Messages to C.

Defendant often communicated with C. by text. Screenshots of C.'s phone showing text messages between defendant and C. and a certified translated transcript of the messages (the messages were in Spanish) were admitted in evidence.

In one text thread, defendant texted, "I'm not going to do anything to you anymore." He texted that he was "going to start being good." Defendant texted that he swore "by the baby that your mom has in her belly" that he was "not going to do anything to you anymore." During this text conversation, C. was in her room, and defendant was downstairs in the living room. C. testified it was typical for defendant to text her late into the night even when she did not respond.[2]

---

[2] In some of the text threads, defendant told C. to erase his messages, which she understood to mean all the messages "where he would ask [her] to

5

In another text thread from November 27,[3] defendant asked C. to come down for a little while. C. testified she understood this to mean "he wanted to rape me again." Another time, defendant texted, "I'll give you 50," which C. understood meant he would give her $50 to have sex. C. wrote that she did not want his money, and he responded, "just five minutes and that's it" and he "won't take long." In a different text thread, defendant asked C. for a photo of her vagina and promised he would never bother her if she sent him a photo. (C. testified that she did not send a photo.) In another text thread, defendant mentioned "one time when we did it you kissed me." C. testified defendant was referring to "[w]hen he was raping me." Another time, defendant texted, "do you want me to shut off your phone and give your phone to (S.)." C. explained that defendant "threatened to take [her] phone away all the time."

S.'s Testimony

At trial, S. was 13 years old. S. testified about the first time defendant "[t]ouched me in a specific way," which happened when S. was nine years old. Defendant told S. to go to Mother's bedroom, and he closed the door. Defendant said he would give S. $20 and told her to lie down on the bed. S. had her clothes on. Defendant "went on top" of S. and "started moving around." S. felt his penis and it was hard.

S. thought she was still nine when the next incident occurred. S. was lying down with Mother, who was sleeping. Defendant had been outside drinking with his friend. He came inside and went to S.'s side of the bed and

---

come downstairs." Sometimes defendant "made [C.] delete them in front of him."

[3] The year was not specified, but C. provided her phone to the police in June 2021, so the texts were from 2020 or earlier.

6

"started touching [her]." S. testified he touched her "[i]n my vagina" "[o]ver" her clothes. She pushed his hand away. He whispered to S. to go downstairs, but she stayed in the bedroom. Then S. went to the bathroom, and defendant told her to come downstairs. She went downstairs, and he told her to go on the couch. She was on her stomach. Defendant took off her pants and underwear. S. testified, "Then he put his private part in me." She testified he put his penis "[i]n my vagina" and, "I felt it in me." "He started putting it in and out." Defendant put his penis "[i]n [her] butt," and "[i]t felt wet."[4] Afterward, defendant put on his pants and told S. to put her pants on. S. went to the bathroom and noticed, "[w]hen [she] wiped, it was red." She felt "[a] little bit" of pain. S. had not started having periods at that time, and she testified she was concerned because, "I was too young to have my period."

The next incident S. remembered occurred in June 2021 on the same day C. disclosed defendant's conduct to Maribel and the police. S. and her family were at defendant's friend's house in the backyard. People were eating and drinking and there were oysters. S. walked by defendant, and he started touching her over her clothes. S. testified, "He was squeezing my boobs." S. could tell defendant was drunk by the way he acted and smelled; she observed, "when he touched me[,] he was drunk."

Back in their bedroom that night, C. told S. that something was happening between her and defendant. C. was crying. S. testified that she

_____

[4] When the prosecutor asked S. whether defendant "put [his penis] anywhere other than your vagina," S. responded, "I don't remember." Then S. reviewed the transcript of her forensic interview, and this helped her remember that defendant put it, she testified, "In my butt." (The forensic interview took place in June 2021; S. testified at trial over three years later in July 2024.)

began crying, too, "[b]ecause the same thing was happening to her and me." C. texted with S.'s sister Maribel, and Maribel came and picked them up.

S. and C. spent the night at Maribel's house. The next morning, S. spoke to a woman about what happened to her. This was a forensic interview.

S.'s Forensic Interview

The video recording of S.'s interview was played for the jury and admitted in evidence. In the interview, S. described the first incident in Mother's bedroom: "I was laying down on my stomach and then he was on top of me." Defendant "was moving around on top of me." "He was trying not to put all his weight on me . . . while he was moving around." Defendant's breathing was "[l]oud," and S. could feel his "dick" "[o]n my butt." Defendant gave her $20, and S. went back to her bedroom with C. Mother came home a couple hours later.

As to the incident on the couch, S. told the interviewer defendant took off her clothes, and S. told defendant in Spanish, " 'Stop it, don't do this.' " Defendant "said, uh, I can touch you"; "[S]. said only 5 minutes, but he said, like, more than 5 minutes." Defendant took off his own shorts and underwear. S. told the interviewer, "Then he starts to put it in my butt and he told me to turn around." S. said defendant put "[h]is dick" "in my butt," and "after he did that[,] he told me to turn around." She said, "And then he put it [in] my pussy." Asked what defendant's penis felt like "when he put it . . . in your butt," S. said, "It was wet. I did not like it." S. continued, "He just put it in and he started going fast but I told him to stop. I made a noise but he told me to be quiet." The interviewer asked what happened when "he put his dick in your pussy." S. said, "He—he put me up and put my legs up, started putting it in and I did not like it." Asked how her body felt, S.

8

responded, "Uncomfortable and I was scared." She said she "was shaking a little bit."

S. told the interviewer something like that happened "only two or three or five times." S. said, "the other times he just did it on top of my clothes." "He, like, moved around on me when I was on my stomach laying down." Defendant did this "[w]ithout clothes" "[j]ust one" time.

Defendant's Police Interview and Apology Letter

Defendant was interviewed by Fairfield police officers on the morning of June 14, 2021,[5] and the video recording of his interview was played for the jury and admitted in evidence. Defendant initially denied he had sex with C. but later admitted it. Defendant said he had sex with C. three or four times. He denied he ever had sex with S.

During the interview, defendant said he wanted to apologize to C. He wrote an apology letter, which was admitted in evidence. Among other things, defendant wrote, "I know I have done a lot of things to you" and "I have hurt you," and he asked for forgiveness.

Prosecution Expert

A clinical psychologist testified as the prosecution's expert in child sexual abuse accommodation syndrome. He explained that children who are sexually abused tend to delay disclosure for months or years, and disclosure may seem unconvincing if "people expect consistency of being told information the same way each time when [a child is] asked about something." Instead, "[d]ifferent details might come out over time," which is called incremental or piecemeal disclosure.

---

[5] Defendant was in custody because he had been arrested for public intoxication.

9

*The Defense*

The defense called three witnesses: a defense investigator, an expert on forensic interviews with children who have been sexually abused, and a school friend of C.'s.

The defense investigator, who interviewed Maribel in May 2024, testified Maribel told her that S. said she was not raped.[6]

A professor of clinical psychology testified as a defense expert in forensic interviews, memory, and child sexual abuse accommodation syndrome. He testified errors with memory are of two categories: errors of omission, which is "erosion of memory," and errors of commission, which is when people "think they remember things that happened to them when . . . it didn't happen." He explained that errors of commission can be the result of suggestibility; for example, a "leading or suggestive" question from an adult "can influence children to then accept" as fact a premise of the question. The professor testified that people tend to remember the core details of a traumatic event. "So children who have been sexually abused, their core details are: Who did it, where did it occur, what the acts were, how many times the acts occurred roughly, when it—when it occurred, whether there was pain involved, who was around."

As to the subject of child sexual abuse accommodation syndrome, the professor testified that "it did not have the ability to help the jurors decide whether the allegation was true or false and it should never be used in a court of law."

---

[6] Maribel was a prosecution witness at trial.

Jordan D., who was 16 years old at the time of trial, testified that C. was his friend in middle school in 2019. He testified that C. never told him she had been sexually abused by her stepfather.

*Verdict and Sentence*

The jury found defendant guilty of all counts and, as to counts 3 through 9, found true the allegation that defendant committed the offense against more than one victim. The trial court sentenced defendant to 25 years to life in prison for each of counts 1 and 2 and 15 years to life in prison for each of counts 3 through 10, with all terms to be served consecutively, for an aggregate indeterminate sentence of 170 years to life in prison.

## DISCUSSION

A. *Trial Court Response to Jury Question*

Defendant contends the trial court committed reversible error "by failing to clarify the jury's confusion regarding the unanimity requirement" thereby "infringing upon [his] constitutional right to be convicted only by unanimous verdict." (Capitalization omitted.) We find no error in the court's response to the jury question at issue.[7]

1. <u>Additional Background</u>

As part of the instructions to the jury, the trial court gave a date range for when each charge was alleged to have occurred (CALCRIM No. 207)[8] and separately explained the elements of each of the charged offenses.

---

[7] Defendant's appellate claim pertains to two (of five) questions submitted by the jury. In his reply, defendant clarifies that he claims error only as to the court's response to the second of the two jury questions.

[8] The trial court instructed the jury with CALCRIM No. 207 (proof need not show actual date) as follows: "It is alleged in Counts 1 through 4 that the crimes occurred on or about January 14, 2020, through January 13, 2021. [¶] It is alleged that . . . Count 5 occurred on or about June 13, 2021. [¶] It is alleged that Count 6 occurred on or about April 27, 2016, through April 26,

11

In his closing argument, the prosecutor identified the conduct that corresponded with each of the charges. As to the charges related to S., the prosecutor told the jury, "Counts 1, 2, and 3 for (S.) are all for the same incident" that began with S. lying next to her sleeping mother. The prosecutor argued count 1 (sodomy) was supported by S.'s testimony that defendant " 'starts to put it in my butt and he told me to turn around.' " Count 2 (sexual intercourse with a child) was the conduct S. described as defendant "putting his penis in her vagina for a period of time on the couch." Count 3 (lewd act) was "for [earlier in the encounter] when [defendant] starts touching her while . . . her mom is sleeping next to her." Count 4 (lewd act) was "referencing [defendant] rubbing . . . himself on her in the past," i.e., the first incident S. remembered when defendant moved his body around on top of her and then gave her $20. Count 5 (lewd act) was "at this . . . oyster party . . . where the defendant grabbed her chest."

As to the charges related to C., the prosecutor argued count 6 (lewd conduct) was "the first incident that she remembers" when defendant said he would buy C. an iPod. Count 7 (lewd act) was "the first time C. talks about the defendant actually having intercourse with her." For counts 8 and 9 (lewd act), the prosecutor stated, "[I]t happened a number of times, and some of these events blurred together. . . . But [C.] did remember talking about this incident in June or July of 2020 as well as an incident in September of

2017. [¶] It is alleged that Count 7 occurred on or about December 1, through December 31, 2019. [¶] It is alleged that Count 8 occurred on or about June 1, 2020, through July 31, 2020. [¶] It is alleged that Count 9 occurred on or about September 1, 2020, through September 30th, 2020. [¶] It is alleged that Count 10 occurred on or about January 1, 2021, through January 31, 2021. [¶] The People are not required to prove that the crimes took place exactly on those days but only that they happened reasonably close to those days."

2020 shortly after they got back from Granite Bay." Count 10 (aggravated sexual assault) was "the January 2021, incident" when "(C.) grabs a knife in the kitchen" and defendant "takes it from her and tosses it on the table," "forces his way in" the bathroom, and "rapes her."

2. Jury Questions, Discussion, and Trial Court Responses

On the second day of deliberations, the jury sent the following note to the court: "on counts 3-10 what was the specific location the alleged[] events happen. for example was #9. [a]fter/during Granite Bay, #6 lap sitting? [¶] We are looking at counts 1-5 S.[ ] and 6-10 C. [ ]."

The trial court read the note to counsel and stated it could not "discern what it is they are asking." Defense counsel responded that, "at a basic level, what it appears they are asking I don't think we can answer." She suggested that, as to the question "what is the specific location," "the Court can answer: . . . we cannot give you factual answers. That's something that you, as a jury, has [*sic*] to decide . . . ."

The trial court proposed language for a response, defense counsel and the prosecutor agreed to it, and the jury received the following response to its first question: "The Court does not understand your question. Are you asking for readback from the court reporter? You as the jury decide what the facts are."

The jury then submitted a second note: "Does each count correspond to a specific event? Can we know the specific event that corresponds to each count?"

After reading the second note to counsel, the trial court stated its intention to "reiterate the jury is the fact-finder" and to refer the jury to two

13

instructions: CALCRIM No. 207, which provided the date range by count (see footnote 8, *ante*) and CALCRIM No. 3500 on unanimity.[9]

The court reasoned: "I noticed [the jurors] were all so engrossed in your closing argument . . . . I didn't see jurors taking many notes. Obviously, that was a big moment for everybody to address, you know, *which acts went with which count.* Some are very easy, like Count 1 and 2 are specific event[s] and Count 10 is a very specific event. But I can see when you have testimony regarding a great number of events, it can blur even in the mind of the jury." (Italics added.) The court noted that the jury did not have the complaint, which identified the date range for each count, and the verdict forms lacked dates. The court explained CALCRIM No. 207 was responsive because it was "[t]he instruction that refers to those specific dates."

The prosecutor said he was "okay with that" and suggested, "if we get an additional question about this, it may be appropriate to ask them if reopening argument for a limited purpose might address that specific concern."

The trial court responded to the prosecutor: "I think before you do that [i.e., offer to reopen argument], [CALCRIM No.] 207 answers the question. It

---

[9] The jury had been given CALCRIM No. 3500 (unanimity) as follows: "The defendant is charged with Lewd Act Upon a Child involving S.[ ] in Counts 3, 4 and 5. [¶] The defendant is charged with Lewd Act Upon a Child involving C.[ ] in Counts 6, 7, 8 and 9. [¶] The defendant is charged with Aggravated Sexual Assault of a Child—Rape in Count 10.

"The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

14

answers generically which count goes to which time period. But they may need . . . read-back of (C.) and (S.)'s testimony . . . ."

The court also observed, "[T]here is a little bit of just settling down and getting into the groove of deliberating and going back through the notes. They got a late start today because an individual had an unexpected medical appointment. [¶] I think they're probably going to be recessing here shortly anyway."

Defense counsel offered no comment during the discussion about how to respond to the second note from the jury.

The trial court provided the jury the following response: "Please refer to Instructions 207 and 3500. You as the jury decide what the facts are."

The jury asked no further question about which events or evidence corresponded with which counts.

3.      Analysis

"Under Penal Code 'section 1138[10] the court must attempt "to clear up any instructional confusion expressed by the jury." [Citation.]' [Citation.] 'This means the trial "court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to

_____

[10] Penal Code section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

15

satisfy the jury's request for information." ' " (*People v. Yarbrough* (2008) 169 Cal.App.4th 303, 316–317, italics deleted (*Yarbrough*).)

"Penal Code section 1138 does not demand elaboration upon the standard instructions by the trial court when the jury expresses confusion, but rather directs the court to 'consider how it can best aid the jury and decide whether further explanation is desirable, or whether the reiteration of previously given instructions will suffice.' " (*Yarbrough, supra*, 169 Cal.App.4th at p. 317.)

"In exercising [its] discretion, the trial court 'must at least consider how it can best aid the jury.' " (*People v. Giardino* (2000) 82 Cal.App.4th 454, 465.) We review a trial court's response to a jury question for abuse of discretion. (*People v. Eid* (2010) 187 Cal.App.4th 859, 882.)

Defendant contends the trial court abused its discretion in responding to the jury's second question "by simply repeating an instruction [(CALCRIM No. 3500)] the jury clearly did not understand." (Capitalization omitted.) He argues the court should have referred the jury to CALCRIM No. 3515 (multiple counts: separate offenses),[11] as well as CALCRIM No. 3500, and provided the jury "a simple explanation of what these two instructions mean together."

Defendant's position is based on the presumption that the jury's questions evinced confusion about CALCRIM No. 3500's unanimity requirement, but we are not convinced the jury was confused on this point. As the Attorney General argues, the jury did not ask about the unanimity instruction and "did not convey confusion about unanimity."

---

[11] The jury had been instructed with CALCRIM No. 3515: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one."

16

Indeed, neither the trial court nor counsel understood the jury's questions as expressing confusion about the legal principles the jury was asked to apply.  Rather, the court and counsel read the jury's notes as asking *factual* questions that indicated the jury might be confused about which acts corresponded with which counts but did not demonstrate the jury was confused about the unanimity requirement.  On our review of the record, we find this understanding of the jury's questions eminently reasonable.  The jury first asked about the "specific location" of each count.  Defense counsel thought the jury was asking a factual question, and she reasonably suggested that the court remind the jury that it was the jury's job to determine the facts.  Next, the jury submitted a note that read: "Does each count correspond to a specific event?  Can we know the specific event that corresponds to each count?"  The trial court interpreted this note as asking "which acts went with which count."  The prosecutor shared this understanding, as he suggested it would be helpful to reopen argument, presumably so he could further explain what evidence corresponded with each count.  The court, however, reasonably proposed an initial response of referring the jury to CALCRIM No. 207, which "answer[ed] generically which count goes to which time period."  We find the court's response appropriate under the circumstances.

Here, we observe that defendant does not claim that either the jury instructions or the court's responses to the jury's questions misstated the law.  His only claim is that the trial court abused its discretion in responding to the jury's question.  But the record demonstrates the trial court reasonably considered how it could best aid the jury (*People v. Giardino, supra*, 82

17

Cal.App.4th at p. 465) and its response was appropriate.  Defendant has failed to show an abuse of discretion.[12]

B.    *Sufficiency of the Evidence to Support Count 1*

Next, defendant argues his conviction for sodomy in count 1 (§ 288.7) lacks substantial evidentiary support.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]  [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder."  (*People v. Jones* (1990) 51 Cal.3d 294, 314 [holding a child's generic testimony regarding molestations may constitute substantial evidence despite its nonspecific character].)

"[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction."  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  "[W]e may not

---

[12] Because we have addressed the merits of defendant's appellate claim, we need not consider his alternative argument that his trial counsel was ineffective in failing to object to the trial court's response to the jury's question.

reverse for insufficient evidence unless it appears ' "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Paz* (2017) 10 Cal.App.5th 1023, 1039 (*Paz*).)

"Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person. Any sexual penetration, however slight, is sufficient to complete the crime of sodomy." (§ 286, subd. (a).)[13] "Sexual penetration, in turn, is penetration of the anal opening. (§ 289, subd. (k)(1).) Taken together, the crime of sodomy requires the perpetrator to penetrate the anal opening and to make contact with the anus." (*Paz, supra,* 10 Cal.App.5th at p. 1036, italics omitted.)

In *Paz*, the Court of Appeal "h[e]ld that sexual penetration requires penetration of the tissues that surround and encompass the lower border of the anal canal—that is, it requires penetration past the buttocks and into the perianal area but does not require penetration beyond the perianal folds or anal margin. [¶] . . . [However,] '[a]n intrusion into the space between a person's buttocks, while perhaps a necessary step on the path to intrusion of the anal opening, is not, in itself, an intrusion into the anal opening.' " (10 Cal.App.5th at p. 1038.) The *Paz* court observed that "courts are inclined to take a broad view of genital boundaries" given that "[t]he 'essential guilt' of both rape and forcible sodomy 'consists in the outrage to the person and feelings of the victim.' (§ 263.)" (*Paz*, at p. 1037.)

Defendant argues S.'s statements at trial and in her forensic interview "did not adequately describe the necessary element [of] actual anal penetration, however[ ] slight." We are not persuaded.

---

[13] The jury in this case was properly instructed that sodomy requires "penetration, no matter how slight, of the anus of one person by the penis of another." (CALCRIM No. 1127.)

19

At trial, the prosecutor asked S. if defendant put his penis anywhere other than her vagina, and S. responded, "*In* my butt." (Italics added.) He asked what she felt, and S. responded, "His penis." The prosecutor asked how it felt, and S. responded, "It felt wet."

In the forensic interview (which was played for the jury), S. said that after defendant took off his underwear, "Then he starts to put it in my butt and he told me to turn around." The interviewer asked what he put in her butt, and S. said, "[h]is private part," and another word for this was "dick." The interviewer asked what it felt like. S. responded, "I did not like it." S. continued, " 'Cause he used to do it on top of my clothes but, like, that was the last time he did it because I—I didn't let him because he wanted to do it again, but I didn't let him." Asked how she ended up on her stomach on the couch, S. responded, "[Defendant] told me to lay down on my stomach." Asked what happened next, she said, "Then after he did that he told me to turn around." "And then he put it in my pussy."

The interviewer again asked, "when he put it in your—in your butt, what did his dick feel like?" S. responded, "It was wet. I did not like it." The interview asked, "when you say that he put it in your butt, tell me everything that he—he did to your butt with his dick." S. responded, "He just put it in and he started going fast but I told him to stop. I made a noise but he told me to be quiet." Asked what her body felt "when he was putting his dick in your butt," S. said, "Uncomfortable." The interviewer asked, "What about your butt? What could your butt feel?" S. answered, "Uncomfortable as well." Afterward, S. went to the bathroom and saw red when she wiped herself and felt "[a] little bit" of pain.

We find the totality of the evidence at trial—including that defendant took off S.'s clothes and his own clothes, put his penis "in [her] butt" and

"started going fast," then turned her over and "started putting it in and out," and afterward S. bled and felt some pain—was sufficient to support the jury's conviction of sodomy.

Defendant argues the evidence was insufficient because S. "equated the charged sodomy with other incidents when [defendant] rubbed against her with his clothes on, and she did not recall the incident being physically painful." We disagree. In describing the first incident when defendant gave her $20, S. said she felt defendant's "dick" "*On* my butt." (Italics added.) In contrast, when she described the incident on the couch, S. testified defendant put his penis "*In* my butt," and "It felt wet." (Italics added.) S. said defendant "put it in and he started going fast" and S. "made a noise." That S. described the incident as "[u]ncomfortable" rather than extremely painful is not dispositive. We note that S. similarly described the vaginal penetration as "[u]ncomfortable" and indicated that incident resulted in bleeding.

On this record, we cannot say that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction of sodomy. Defendant's remaining arguments are unpersuasive.[14]

C.    *Sentencing Error*

At sentencing, the trial court stated all 10 counts were "subject to mandatory consecutive sentencing pursuant to Penal Code 667 and 667.61."

---

[14] Defendant cites the prosecutor's closing argument, but he raises no claim of prosecutorial misconduct and argument is not evidence and has no relevance to our assessment of the sufficiency of the evidence. Defendant also cites out-of-state authority where the courts found the victims' descriptions of conduct insufficient to establish sodomy. These cases do not persuade us that the evidence in the present case was insufficient.

21

It is undisputed the trial court was mistaken on this point.[15]  Consecutive sentencing is not mandatory for convictions of lewd acts under section 288, subdivision (a) (counts 3 through 9).  (See *People v. Caratachea* (2024) 107 Cal.App.5th 392, 400 ["Neither Penal Code section 667.6 nor section 667.61 requires consecutive sentences for . . . lewd act convictions [under section 288, subdivision (a)], which means the trial court had discretion to impose concurrent sentences"].)  Nor do the statutes require consecutive sentences for violation of section 288.7, subdivision (a) (counts 1 and 2).  (See §§ 667.6, subd. (e) [does not list section 288.7], 667.61, subd. (c) [same].)

When a trial court is unaware of the scope of its discretionary powers at sentencing, the usual remedy is remand for resentencing.  (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)  Remand is unnecessary, however, when "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' "  (*Ibid.*)

Here, the record clearly indicates the trial court would have reached the same conclusion even if it had been aware of its discretion.  After stating its incorrect belief that consecutive sentencing was mandatory, the trial court went on to explain that, even if not statutorily required, it would impose consecutive sentences in its discretion.  The court said: "But I will also indicate for the record that even if they weren't subject to mandatory consecutive sentencing, I would impose mandatory [*sic*] consecutive sentencing.  The offenses meet several of the criteria for aggregating [*sic*]

_____

[15] Section 667, cited by the trial court, has no application in this case; this statute governs sentencing for persons with prior convictions for serious or violent felonies, but defendant had no prior criminal record.

22

circumstances, . . . which can be considered by the Court in determining whether to run a sentence consecutive or concurrent."[16]

The court then gave its reasons for imposing consecutive sentences. The court explained: "Specifically the aggravating factors in this case include the crimes involved violence and threats of great bodily injury and a high degree of cruelty; the victims were vulnerable; the defendant threatened or dissuaded witnesses from testifying; and the defendant took advantage of a position of trust.

"In addition to those considerations, consecutive sentencing is warranted because the crimes were predominantly independent of each other, the crimes involve separate acts of violence, and the crimes were committed at different times or places and do not reflect a single period of aberrant behavior.

"In addition, Count 1 and 2 involved the same date but an incident of sodomy and rape. The evidence at trial showed that the defendant had a reasonable opportunity to reflect upon his actions and therefore that was not one single continuous course of conduct when he terminated the sodomy, flipped over the little girl, and began the rape.

---

[16] "Any circumstances in aggravation or mitigation, whether or not the factors have been stipulated to by the defendant or found true beyond a reasonable doubt at trial by a jury or the judge in a court trial, may be considered in deciding whether to impose consecutive rather than concurrent sentences," except for a fact used to impose an upper term or otherwise enhance the sentence or a fact that is an element of the crime. (Cal. Rules of Court, rule 4.425(b); see *People v. Catarino* (2023) 14 Cal.5th 748, 755 [a sentencing court's decision to impose consecutive terms does not implicate " ' "the Sixth Amendment's restriction on judge-found facts" ' "].)

"The defendant having been convicted—in addition to Counts 1 through 10, the jury also found as true pursuant to 667.61 that the defendant committed those offenses against two victims."

The trial court, thus, made a thorough record stating the reasons it would exercise its discretion to impose consecutive sentences. (See Cal. Rules of Court, rule 4.406(b)(4) [sentencing choice to impose consecutive sentences requires a statement of reasons].) The court, moreover, expressly stated, "for the record," that "even if [the counts] weren't subject to mandatory consecutive sentencing," it would still impose consecutive sentences as a matter of discretion. By its statement, the trial court clearly intended to indicate that it would impose the same sentence if it had discretion to choose between concurrent and consecutive sentences in order to avert remand in precisely the current circumstance. We see no reason to remand for resentencing on this record. (See *People v. Barber* (2020) 55 Cal.App.5th 787, 814 [remand was unnecessary where "the detailed reasoning the court put into its decision" "indicate[d] that the trial court would have reached the same conclusion had [it] exercised its discretion"].)

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Stewart, P. J.


_____
Richman, J.


A171657, *People v. Mendez Alvaro*